2005 WY 122

In the Matter of The Worker's Compensation Claim of Thomas ANASTOS, Appellant (Petitioner/Employee–Claimant),

v.

GENERAL CHEMICAL SODA ASH, Appellee (Employer/Respondent),

and

State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellee (Objector/Respondent).

No. 04–211.

Supreme Court of Wyoming.

Sept. 27, 2005.

Representing Appellant: Sean W. Scoggin of Tiedeken & Scoggin, P.C., Cheyenne, Wyoming.

Representing Appellee General Chemical Soda Ash: Stephen H. Kline of Kline Law Office, P.C., Cheyenne, Wyoming.

Representing Appellee State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division: Patrick J. Crank, Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; and Kristi M. Radosevich, Assistant Attorney General, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Thomas Anastos was injured while working for General Chemical Soda Ash. The Wyoming Workers' Compensation and Safety Division awarded Anastos temporary total disability[1] benefits for diagnosis and treatment of a back injury it deemed to be work-related. Anastos' doctor released him to return to work and the Division awarded an eight percent permanent partial impairment rating,[2] thereby terminating Anastos' temporary total disability benefits. Anastos objected to the eight percent permanent partial impairment rating, because he claimed that he continued to suffer from headaches and vision problems resulting from the work injury. The matter was referred to the Medical Commission, which held a contested case hearing. The Medical Commission determined that Anastos failed to prove his headaches were caused by his work-related injury and that he was not, therefore, entitled to temporary total disabili-

---

1. Wyoming defines "temporary total disability" as "that period of time an employee is temporarily and totally incapacitated from performing employment at any gainful employment or occupation for which he is reasonably suited by experience or training. The period of temporary total disability terminates at the time the employee completely recovers or qualifies for benefits under W.S. 27–14–405 or 27–14–406[.]" Wyo. Stat. Ann. § 27–14–102(a)(xviii) (LexisNexis 2001). The purpose of temporary total disability benefits is "to provide income for an employee during the time of healing from his injury and until his condition has stabilized." *Pacific Power and Light v. Parsons*, 692 P.2d 226, 228 (Wyo. 1984).
*Phillips v. TIC–The Indus. Co. of Wyoming, Inc.*, 2005 WY 40, ¶ 27, 109 P.3d 520, 532 (Wyo.2005).

2. With regard to permanent partial impairment, *Phillips*, 2005 WY 40, ¶ 37 n. 21, 109 P.3d at 535–36 n. 21, explains:

The Division's rules state that an initial application for permanent partial impairment benefits may be filed when a worker "has suffered an ascertainable loss as defined in W.S. § 27–14–102(a)(ii)" and the worker may thereafter apply for permanent partial, or permanent total, disability awards pursuant to Wyo. Stat. Ann. §§ 27–14–405 or 17–14–406 based "upon the rating given by the physician...." 3 Weils Code of Wyoming Rules, *supra*, at ch. 5, § 4(d)(i) and (ii), 025 220 001–17. Similarly, to collect temporary total disability benefits beyond the maximum period allowed by statute, one must show, among other things, that he "does not have an ascertainable loss which would qualify for benefits under W.S. § 27–14–405 or 406[.]" 3 Weils Code of Wyoming Rules, *supra*, at ch. 7, § 2(b)(i)(D), 025 220 001–20.

ty benefits after November 9, 2001. This appeal is from the district court's affirmance of the Medical Commission's determinations.

## ISSUES

1. Whether the Medical Commission's denial of worker's compensation benefits for Anastos' headaches was supported by substantial evidence?

2. Whether the Medical Commission's denial of temporary total disability benefits after November 9, 2001, was supported by substantial evidence?

## FACTS

[¶ 2] On April 28, 2001, Anastos was injured while working as a mine hoist operator for General Chemical. Anastos met with Dr. Lee Balka, the company physician, on May 1, 2001. Dr. Balka diagnosed Anastos with a rhomboid muscle strain, prescribed an anti-inflammatory, and allowed him to return to work with orders to contact the doctor if the strain did not resolve itself within ten days. Anastos claims that he also reported headaches to Dr. Balka, but the doctor's records contain no mention of such headaches. Following his visit with Dr. Balka, Anastos returned to work and continued working in his capacity as a hoist operator until June 7, 2001.

[¶ 3] On May 30, 2001, Anastos called the Division to report the injury. The report described Anastos' injury as "picking up weight felt pain in back." On June 12, 2001, Anastos signed the employee's report of injury and added to the description of the injury, "neck, shoulders, legs, knees, feet, hip and head." General Chemical's report of the injury referred to Dr. Balka's notes and described Anastos' injury as a rhomboid muscle strain and indicated that it believed the injury was work-related. Treatment for Anastos' back injury was not contested by either the Division or General Chemical, and the Division issued a Final Determination finding that Anastos' back injury was compensable.

[¶ 4] On June 1, 2001, Anastos went to see Dr. John Whipp, an orthopedic surgeon. Dr. Whipp's notes indicate that Anastos was suffering from pain in the right shoulder and lower back. Although Anastos claims that he complained of headaches to Dr. Whipp at this time, Dr. Whipp's records reflect no such complaint. Dr. Whipp saw Anastos again on June 15, 2001. Once again, Dr. Whipp's records contain no mention of headaches; however, he testified that he thought headaches would have been one of the symptoms prompting a neurological referral. Dr. Whipp described Anastos' complaints as "bizarre" and referred Anastos to Dr. Peter Crane, a neurologist.

[¶ 5] Dr. Crane examined Anastos on July 18, 2001. A follow-up letter from Dr. Crane to Dr. Whipp represents the first documented report of Anastos' headaches. Although Dr. Crane found it "difficult to get a good history from [Anastos]," he described Anastos' symptoms as follows:

> [t]he headache radiates from the back of his head over the top of his head, can be more on one side than the other, settles in the frontal areas and occasionally the temporal areas, and when severe, the headaches are associated with blurred vision, more in the right eye than the left.

Dr. Crane also noted that Anastos claimed to have been experiencing these headaches since the injury at work, but that they were not quite as severe as initially. Dr. Crane's impression was that Anastos suffered a "[s]udden onset of generalized headache with persistence since 5/28/01 of uncertain etiology." He ordered a cranial MRI and MRA, and a cervical MRI. The results of the cranial tests were normal. The cervical MRI revealed a slight dislocation of a cervical vertebra (C5/6); however, Dr. Crane informed Anastos that this was not causing the headaches. Dr. Crane concluded that he thought the headaches may be related to stretching of ligaments and muscles and that they could be treated. However, Dr. Crane's records indicate that Anastos did not feel comfortable with Dr. Crane's opinion and proposed treatment, and that Dr. Crane advised Anastos that he could seek a second opinion if he so wished.

[¶ 6] Dr. Crane referred Anastos back to Dr. Whipp, who recommended physical therapy. Anastos attended physical therapy for

approximately a month and a half, and then on September 21, 2001, Dr. Whipp made the following notation:

> I have reviewed his situation and basically right now there is not much that Physical Therapy thinks they can do for him. In my opinion, I do not believe that he has anything which can be treated surgically, and evidently Dr. Crane does not feel that he has anything that warrants aggressive treatment.... So my recommendation is for him to try a different job if he can make these arrangements with the company or at least modify his current job, but I do think that one either needs to return him back to work or he needs to think about other career choices.

During this time, Anastos reported to Dr. Whipp that his headaches had improved.

[¶ 7] On October 5, 2001, Dr. Ann MacGuire performed an independent medical examination of Anastos to determine whether his current problems were related to his original work injury. Dr. MacGuire diagnosed Anastos with "1) Upper body/neck strain. 2) Low-level depression, most likely pre-existing." She concluded that Anastos had reached maximum medical improvement, gave him a five percent impairment rating of the whole person, and stated that he could return to his previous job with a fifty pound lifting restriction.

[¶ 8] On November 2, 2001, Dr. Whipp's notes indicate that he had reviewed Dr. MacGuire's report. He stated that he agreed with Dr. MacGuire's conclusion that Anastos had reached maximum medical improvement and that it was time to ascertain a physical impairment rating. Dr. Whipp also stated that Anastos had told him that he did not wish to return to his previous employment with General Chemical and was going to try for early retirement. Nonetheless, with the recommendation of Drs. MacGuire and Whipp, Anastos returned to work at General Chemical on November 9, 2001, working in a light duty job as a janitor. Anastos worked in that capacity for approximately one month and then left work and never returned.

[¶ 9] On November 28, 2001, Anastos visited Dr. Crane again and reported continued headaches, dizziness, blurred vision, double vision, sensitivity to light, sensitivity to noises, and frequent vomiting. Finding these symptoms difficult to explain, Dr. Crane referred Anastos to Dr. Kathleen Digre, a neuro-opthamologist at the University of Utah. Dr. Digre saw Anastos on January 10, 2002. In a letter to Anastos' attorney, Dr. Digre stated:

> His headache has been peculiar in that when he lies down he does better and when he is upright he has more pain indicating that he has positional headaches that seem to come on with exertion.... It was my impression [when I examined Anastos] that his headache had some migraine features. However it did seem to start after he had lifted these weights in part of his job. I wondered whether at some point he could have a low pressure headache syndrome which then [led] to more migraine related headaches. His headaches at the present time now are really exertional headache[s].

> Therefore I would suggest at least by the patient[']s history that his symptoms are linked to the work related event of April of 2001. He may have started out with a low pressure headache but the headache he is having now is more migrainous and certainly exertion valsalva maneuvers [3] can make migraines occur.

Dr. Digre also concluded that Anastos' vision problems were not related to his work, but rather were genetically inherited abnormalities. Later, in her deposition testimony, Dr. Digre described Anastos' reported history with his headaches as "unusual" and "striking...." She went on to list a number of potential causes for Anastos' headaches, but concluded that no objective evidence existed supporting any of the possible diagnoses. Dr. Digre testified that she did not expect the headaches to persist.

[¶ 10] On December 12, 2001, Dr. MacGuire submitted her report to the Division assessing Anastos a five percent whole

---

**3.** A "valsalva maneuver" is the "inflation of the middle ear by closing the mouth and nostrils and blowing so as to puff out the cheeks." Webster's Third New International Dictionary, 2530 (1993).

person impairment rating. Anastos requested a second opinion, and Dr. Whipp increased the impairment rating to eight percent, with the additional three percent to account for pain. Neither General Chemical nor the Division contested the additional three percent.

[¶ 11]   The Division issued a Final Determination on January 10, 2002, stating that Anastos was not eligible to receive temporary total disability benefits after November 9, 2001, because that was the day he was released to return to work. On June 26, 2002, the Division issued another Final Determination of Permanent Partial Impairment Benefit accepting Dr. Whipp's eight percent whole body impairment rating. Also, the Division issued final determinations denying all of Anastos' claims relating to his headaches and vision problems.

[¶ 12]   Anastos objected to these final determinations and requested a contested case hearing before the Medical Commission. The Medical Commission heard Anastos' case on September 13, 2002, and entered its Findings of Fact, Conclusions of Law and Order of Medical Commission Hearing Panel on November 5, 2002. With respect to Anastos' claimed headaches and vision problems, the Medical Commission stated:

8. With regard to medical treatment and diagnostic testing for Mr. Anastos' headaches and eyes, the Panel FINDS Mr. Anastos has not met his burden of proof. It is undisputed that Mr. Anastos['] eye problems in part stem from non-work related conditions and the remainder of his vision problems relate to his headaches. As to the headaches, the medical records from Drs. Balka and Whipp are clear— there was no mention made of headaches to either doctor two months following the work accident. Had his headaches been causally related to Mr. Anastos' work injury such would have been apparent shortly after the injury. The Panel does not find it credible to believe that two physicians would fail to record complaints of debilitating headaches with associated vision changes.

9. Furthermore, the Panel FINDS that the doctors who examined Mr. Anastos are unclear as to the cause of these headaches. At best the various doctors speculate that Mr. Anastos' headaches may be migraines, muscle-tension, low pressure, cervical, positional or exertional. Migraines are certainly not work-related. A low pressure headache from a spinal fluid leak would have likely resolved by the present time. The remaining causes may or may not be work-related, but the late onset of such headaches in relation to the date of injury weighs heavily against finding that they are work related. Finally, the Panel has serious concerns about pre-existing issues which may be having an effect on [Anastos] as reflected in Dr. MacGuire's report.

The Medical Commission also found:

6. With regard to temporary total disability benefits after November 9, 2001, it is undisputed that Mr. Anastos was at maximum medical improvement by this period of time. Furthermore, by this period of time he was released to return to work although with restrictions. See W.S. § 27–14–404. The Panel FINDS Mr. Anastos is not entitled to additional temporary total disability after November 9, 2001.

[¶ 13]   On December 4, 2002, Anastos filed a Petition for Judicial Review of Agency Action with the district court challenging the Medical Commission's decision. On February 25, 2004, the district court filed a detailed decision letter affirming the Medical Commission's decision. Anastos then filed a timely Notice of Appeal with this Court.

### STANDARD OF REVIEW

[¶ 14]   We recently held that the substantial evidence test is the appropriate standard of review in appeals from Wyoming Administrative Procedures Act contested case proceedings when factual findings are involved and both parties submit evidence. *Newman v. Wyoming Workers Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002)…. Because both parties presented cases-in-chief, we apply the substantial evidence standard. We afford respect and deference to a hearing examiner's findings of fact if they are

supported by substantial evidence. *Haag-ensen v. State ex rel. Workers Comp. Div.*, 949 P.2d 865, 867 (Wyo.1997). Our task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. *State ex rel. Wyo. Workers Comp. Div. v. Waggener*, 946 P.2d 808, 814 (Wyo.1997). We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. *Id.* Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.* A hearing examiner's conclusions of law are afforded no special deference and will be affirmed only if truly in accord with law. *State ex rel. Wyo. Workers Comp. Div. v. Barker*, 978 P.2d 1156, 1159 (Wyo.1999).

*Hermosillo v. State ex rel. Wyoming Workers Safety and Compensation Div.*, 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo.2002).

> When the party charged with the burden of proof has failed to meet that burden, we review the case under the arbitrary, capricious, abuse-of-discretion, or otherwise-not-in-accordance-with-law standard. *Brees v. Gulley Enterprises, Inc.*, 6 P.3d 128, 132 (Wyo.2000); *Keck v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 985 P.2d 430, 432 (Wyo.1999).
>
> > "Under the arbitrary, capricious and abuse of discretion standard, we are charged with examining the entire record. In our examination and review of a hearing examiner's determination, we defer to the hearing examiner's findings of fact. We will examine conflicting and contradictory evidence to see if the hearing examiner reasonably could have made its findings based on all the evidence before it. The findings of fact may include determinations of witness credibility, as the hearing examiner is charged with determining the credibility of the witnesses. In our review, we will not overturn the hearing examiner's determinations regarding witness credibility unless they are clearly contrary to the overwhelming weight of the evidence."

*Brees*, 6 P.3d at 132. . . .

*In re Boyce*, 2005 WY 9, ¶ 6, 105 P.3d 451, 454 (Wyo.2005).

### DISCUSSION

[¶ 15] On appeal, Anastos makes two arguments: he first asserts that the Medical Commission's decision denying payment for treatment of his headaches was not supported by substantial evidence; second, he claims that the Medical Commission's decision denying payment for temporary total disability benefits after November 9, 2001, was not supported by substantial evidence.

[¶ 16] With regard to his first argument, Anastos claims that statements made by his physicians provide substantial evidence to demonstrate that he should have been awarded benefits for his headaches. He first identifies a statement made by Dr. Digre during her deposition where, when asked to give her opinion as to what was causing the headaches, she stated the following:

> Well, from talking with [Anastos] and, you know, and the records that I have available and just listening to his story, because I don't have anything else but his story, and the studies that I was able to review, by history at least it seems like his headache seemed to start after heavy lifting or pulling from his hoist job.

Anastos asserts that the above statement provides substantial evidence of a causal connection between his headaches and his work-related injury.

[¶ 17] Next, Anastos claims that he reported the headaches to both Dr. Balka and Dr. Whipp. He references the following testimony from Dr. Whipp in an attempt to show that he did report the headaches to Dr. Whipp, even though Dr. Whipp did not record such a report.

> Q Okay. When did you next see Mr. Anastos?
>
> A It was 6/15.
>
> Q Okay. I note that you indicated you visited with [Anastos] at length and then the second sentence of your note says, "I want to have him seen by a neurologist." What was your rationale for that?
>
> A Well, there's some pain syndromes that we can kind of classify right away and

put our finger on it and have a pretty good idea of what's going on. [Anastos'] was a bit more vague and a little bit bizarre, and I wasn't certain what was causing his problems. It seems like at that time, and we get busy and don't dictate a very extensive note, but it seems as if at that time he was starting to talk about more head problems. And when they do that and I'm not certain of what's happening and the neurological picture is a bit strange, I usually refer folks to a neurologist at that interval.

Q So between the time you saw him on 6/1 of 2001 and 6/15 of 2001 did he make complaints of headache known to you?

A I believe so. My note actually doesn't say that he was complaining of headaches, but I'm pretty sure that was one of the symptoms that he described to me that caused the neurological referral.

Q Okay. Dr. Whipp, you referenced before your dictation was somewhat limited. That dictation doesn't reflect everything that went on but is just a summary of your visit?

A Well, unfortunately these days we sometimes will see 20 or 30 folks and then go back and just dictate a little bit of a note that says why they were there and it does not entail the whole visit at all, unfortunately.

Q Okay. So as of 6/15 of 2001, you referred Mr. Anastos to the neurologist. Was that Dr. Crane?

A I believe so, sir.

Q Now what was your diagnosis on your initial visit?

A Well, I thought he had some sort of cervical strain or perhaps an early disc herniation, I wasn't certain which, but all of which you treat the same so it didn't make a lot of difference. And we didn't really try to pin anything down, we were treating mostly his symptom pattern initially.

Q With cervical strains and herniated cervical discs, are one of the symptoms headaches?

A Yes.

[¶ 18]  Finally, Anastos alleges that Dr. Crane testified "it was his opinion to a rea-sonable degree of medical probability, that the exertional headaches of Anastos were related to the exertion and injury Anastos suffered on April 2[8], 2001...." The opinion to which Anastos refers was expressed by Dr. Crane during a deposition. In that deposition, Anastos' attorney referenced a letter Dr. Crane wrote on behalf of Anastos and the questioning proceeded as follows:

Q And what does that letter say?

A "To Whom it May Concern: Tom Anastos suffered injury at work on 4/28/01. Among other things he developed severe headaches, which have persisted since that time. I feel that these headaches are tem-porally related to the injury he sustained."

Q Was that your opinion on November 13th of 2001?

A Yes.

Q Okay. Is that still your opinion to-day?

A Well, all it means is that his head-aches began when he had the injury and yes, that's correct, that's still my opinion.

Q Doctor, do you have an opinion, based upon a reasonable degree of medical probability, of whether this exertion that Mr. Anastos described to you of 4/28/01 was the cause of his headaches?

A Well, it's really hard to say a hun-dred percent, but, you know, they began at about the same time so it's kind of hard to say that it's not related.

[¶ 19]  In sum, Anastos argues that the above-quoted statements clearly provide sub-stantial evidence supporting his position that: (1) his headaches began concurrently with his work-related injury, (2) he reported the headaches to Dr. Balka and Dr. Crane when he first visited with them, even though nei-ther doctor's records reflect such a complaint of headaches, and (3) there is a causal con-nection between the work injury and his headaches.

[¶ 20]  In order to be eligible to receive worker's compensation benefits, a claimant must have sustained an "injury" as defined by Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2001). " 'Injury' means any harmful change in the human

organism other than normal aging ... arising out of and in the course of employment while at work...." To demonstrate that an injury arose out of the course of employment, the claimant must establish a causal connection between the work-related incident and the injury. *Hanks v. City of Casper*, 2001 WY 4, ¶ 6, 16 P.3d 710, 711 (Wyo.2001). The claimant bears the burden of proving this causal connection by a preponderance of the evidence. *Clark v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2001 WY 132, ¶ 19, 36 P.3d 1145, 1150 (Wyo. 2001). "A 'preponderance of the evidence' is defined as 'proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence.'" *Matter of Worker's Compensation Claim of Thornberg*, 913 P.2d 863, 866 (Wyo. 1996) (*quoting Scherling v. Kilgore*, 599 P.2d 1352, 1359 (Wyo.1979)).

"[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard....

[U]nder either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

*Hall v. State ex rel. Wyoming Workers Compensation Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo.2001) (quoting *In re Pino*, 996 P.2d 679, 685 (Wyo.2000)). We have said that

[t]he finder of fact is not necessarily bound by the expert medical testimony.... *Forni [v. PathFinder Mines]*, 834 P.2d [688] 693 [ (Wyo.1992)]. It is the hearing examiner's responsibility, as the trier of fact, to determine relevancy, assign probative value and ascribe the relevant weight given to medi-

cal testimony. *Clark [v. State ex rel. Wyoming Workers Safety and Compensation Div.]*, 934 P.2d [1269] 1271 [(Wyo.1997)] (*citing Matter of Workers Compensation Claim of Thornberg*, 913 P.2d [863] 867 [(Wyo.1996)]). "The hearing examiner [is] also in the best position to judge the weight to be given to the medical evidence." *Matter of Goddard*, 914 P.2d [1233] 1237 [ (Wyo.1996)]; *Latimer [v. Rissler McMurry Co.]*, 902 P.2d [706] 711 [ (Wyo.1995)]. "The trier of fact may disregard an expert opinion if he finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based." *Clark*, 934 P.2d at 1271.

*Morgan v. Olsten Temporary Services*, 975 P.2d 12, 16 (Wyo.1999). "In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it." *Bando v. Clure Bros. Furniture*, 980 P.2d 323, 329–30 (Wyo.1999) (*quoting Matter of Worker's Compensation Claim of Thornberg*, 913 P.2d at 868). "Demonstrating evidentiary contradictions in the record does not establish the ruling was irrational, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it." *Bando*, 980 P.2d at 331.

[¶ 21] While none of the doctors who examined and treated Anastos were able definitively to diagnose the cause of his headaches, Drs. Digre, Crane, and Whipp all acknowledged that based on information provided by Anastos, there seemed to be a temporal relationship between the reported headaches and his injury. However, the Medical Commission concluded that

the doctors who examined Mr. Anastos are unclear as to the cause of these headaches. At best the various doctors speculate that Mr. Anastos' headaches may be migraines, muscle-tension, low pressure, cervical, positional or exertional.

We have held that speculative medical testimony is insufficient to satisfy a claimant's burden of proof. *Frazier v. State ex rel. Wyoming Workers' Safety and Compensa-*

*tion Div.*, 997 P.2d 487, 490 (Wyo.2000). None of the tests Anastos underwent revealed any physiological problem causing his headaches, and no doctor ever definitively diagnosed a cause or proper treatment. Without objective evidence, the doctors were forced to rely solely on information Anastos provided and to speculate as to the cause of his headaches.

[¶ 22] The Medical Commission questioned the credibility of Anastos' testimony when it stated:

> Had his headaches been causally related to Mr. Anastos' work injury such would have been apparent shortly after the injury. The Panel does not find it credible to believe that two physicians would fail to record complaints of debilitating headaches with associated vision changes.

We have said that medical opinions based solely on information provided by a claimant whose credibility is in question are suspect and of little value. *Newman v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2002 WY 91, ¶ 31, 49 P.3d 163, 175 (Wyo.2002). In *Newman,* the claimant suffered a back injury while working at a restaurant. *Id.,* 2002 WY 91, ¶ 3, 49 P.3d at 165. Over a year after the initial injury occurred, the claimant began complaining of intermittent headaches and double vision. *Id.,* 2002 WY 91, ¶ 4, 49 P.3d at 165. One of the claimant's doctors filed a report relating the claimant's headaches to her original injury. *Id.* However, the claimant's doctor noted that because he was not able to examine the claimant at the time of her accident, he could only make inferences based on the information provided by the claimant. *Id.* The hearing examiner denied the claimant headache-related benefits and concluded that the claimant's testimony lacked credibility. *Id.,* 2002 WY 91, ¶ 31, 49 P.3d at 175. We affirmed the denial of benefits based on the hearing examiner's conclusion that the doctor's "opinions were based on information provided by [the claimant] as to how the injury occurred and, because [the claimant]'s testimony lacked credibility, those opinions were of little value." *Id.*

[¶ 23] A similar result was reached in *Matter of Krause,* 803 P.2d 81 (Wyo.1990).

There, the claimant injured his hand in 1979 and was awarded worker's compensation benefits. *Id.* at 82. In 1987, the claimant experienced problems in the same hand while operating a hammer drill. *Id.* The problem persisted and he sought treatment with Dr. Madden, a specialist in hand surgery. *Id.* Dr. Madden diagnosed claimant's condition as "an unstable scaphotrapezial trapezoidal joint in his wrist," and testified "that the probabilities" were that the claimant's current injury was a direct result of his original injury. *Id.* The claimant's worker's compensation claim requesting benefits for his wrist injury was denied. *Id.* On appeal, we noted that the claimant's case rested solely on the validity of Dr. Madden's testimony linking the current wrist injury to the claimant's original injury. *Id.* at 83. In affirming the denial of benefits, we noted a number of inconsistencies between the claimant's testimony and what he reported to Dr. Madden. *Id.* at 83–85. With regard to Dr. Madden's testimony, we stated:

> "Where the testimony of a disinterested witness is not directly contradicted but there are circumstances which controvert the testimony or explain it away, or if such testimony is clouded with uncertainty and improbability, or otherwise appears to be unreliable or unworthy of belief, the trier of fact is not bound to accept it."

*Id.* at 83 (quoting 30 Am.Jur.2d *Evidence* § 1083 (1967)). We concluded that "[b]ecause of the inconsistencies in the testimony and deficient medical and work history with respect to [the claimant], the hearing officer did not abuse his discretion in rejecting Dr. Madden's testimony and opinion." *Matter of Krause,* 803 P.2d at 85.

[¶ 24] Because of their speculative nature, the Medical Commission was not bound to accept the expert medical opinions in the instant case. The Medical Commission concluded that Anastos' testimony regarding the cause of his headaches lacked credibility; therefore, the doctors' medical opinions, which opinions relied on the veracity of the information Anastos provided, were insufficient to demonstrate that the headaches were causally connected to Anastos' work-related injury. Consequently, we affirm the Medical

Commission's conclusion that Anastos failed to meet his burden of proof.

[¶ 25] Anastos' second appellate issue—whether the Medical Commission's denial of payments for temporary total disability benefits after November 9, 2001, was supported by substantial evidence—is also resolved by our determination of the first issue. Anastos admits as much in his brief:

> [The second] argument follows the outcome of the determination of the first argument of this brief as the basis for the temporary total disability benefits to continue after November 9, 2001 is that Anastos continued to suffer from the headaches and was unable to return to work with this pain.

It is undisputed that Anastos recovered from the muscle strain-the injury which was initially diagnosed by Dr. Balka and for which Anastos was receiving the temporary total disability benefits. Because we conclude that Anastos did not demonstrate that his headaches were related to his original injury, we affirm the Medical Commission's determination that Anastos was not entitled to additional temporary total disability benefits after November 9, 2001.

## CONCLUSION

[¶ 26] The Medical Commission determined that Anastos' headaches were not related to his original work injury and that he was not entitled to temporary total disability benefits after November 9, 2001. We have reviewed the entire record and are satisfied that the Medical Commission's determinations are supported by substantial evidence. Affirmed.