# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 100

APRIL TERM, A.D. 2013

*August 22, 2013*

IN THE MATTER OF THE
WORKER'S COMPENSATION
CLAIM OF:

MARSHALL S. LITTLE,

Appellant
(Petitioner),

v.                                                      S-12-0268

STATE OF WYOMING ex rel.
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Campbell County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*
    Donna D. Domonkos, Attorney at Law, Cheyenne, Wyoming

*Representing Appellee:*
    Gregory A. Phillips, Wyoming Attorney General; John D. Rossetti, Deputy
    Attorney General; Michael J. Finn, Senior Assistant Attorney General; Michael T.
    Kahler, Senior Assistant Attorney General

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    Appellant Marshall S. Little suffered a lower back injury when he was drawn into a mixing chute of a hot mix plant used by the paving company he worked for in 1988. He underwent a lumbar surgery in 1989.  His condition improved in the early 1990s, and he did not require treatment for his back injury for several years.   In 2007, he began seeing an internist, who diagnosed him with an arthritic hip and recommended a hip replacement.  Mr. Little submitted a bill for $87.00 for the office visit to the Wyoming Workers' Safety and Compensation Division (the Division).

[¶2]    The Division declined to pay the bill because it believed the hip condition to be unrelated to the original work injury.  Mr. Little objected and requested a contested case hearing before the Office of Administrative Hearings (OAH).  The OAH hearing examiner found that Mr. Little was not entitled to benefits for a second compensable injury, relying on an orthopedic surgeon's evaluation that the arthritic hip was not related to the original compensable injury.  The district court affirmed, and we likewise affirm, finding that substantial evidence supports the hearing examiner's findings and conclusions in a case involving conflicting expert opinions.

## ISSUE

[¶3]    Does substantial evidence support the hearing examiner's decision that Mr. Little was not entitled to benefits for a second compensable hip injury?

## FACTS

[¶4]    Mr. Little sustained a compensable injury to his lower back and neck on June 8, 1988.  He worked for Cundy Asphalt & Paving Inc. in Gillette, and he was attempting to repair the conveyor belt on a hot mix plant.   A co-worker accidentally turned the conveyor belt on, and Mr. Little was drawn backwards into an 18 x 24 inch chute and literally folded in half.  He filed a claim for worker's compensation benefits and began a course of treatment with two orthopedic surgeons, Dr. Gerald Baker of Gillette Bone & Joint Clinic and Dr. Robert Snider of Orthopedic Surgeons, P.S.C. in Billings, Montana.

[¶5]    The medical records reflecting treatment of Little's initial injury are incomplete, but we can glean the following from what we have.  Dr. Baker treated Mr. Little from the date of his accident for about two months.  Dr. Baker believed that Mr. Little had suffered a mild to moderate musculo-ligamentous strain of his lumbar spine, and treated him with muscle relaxants, pain medications, and physical therapy.

[¶6]    Dr. Snider first saw Mr. Little about two months after his accident.  His initial clinical impression was that Mr. Little had suffered a lower back sprain and that he had anatomic spinal stenosis or narrowing of the spinal canal at the L3-4 and L4-5 levels of

1

the lumbar spine based on a CT scan ordered by Dr. Baker. He was not certain that Little was suffering from symptoms caused by compression of the spinal nerves due to the stenosis.

[¶7]   Mr. Little reported difficulty walking, as well as pain and numbness in his right leg and thighs. However, a functional capacity evaluation ordered by Dr. Snider and performed by a physical therapist in December of 1988 concluded that Mr. Little's overall pain level did not correlate with his observed capabilities in testing. The evaluation also found poor effort, shaking, and symptom magnification. Dr. Snider's clinic notes from 1988 and 1989 likewise indicated that Mr. Little had "markedly exaggerated responses" to certain testing maneuvers, that he seemed to exaggerate his symptoms at various times during office visits, and that his complaints of pain were anatomically suspect based on the distribution of his perceived pain.

[¶8]   The medical records indicate that Dr. Snider remained unconvinced for a time that Mr. Little had suffered any injury other than a sprain, which did not require surgical intervention. However, in January of 1989, Dr. Snider evidently changed his mind and on February 15, 1989, a decompressive laminectomy at the L3-L4 and L4-L5 level was performed on Mr. Little.[1] The operative report for that surgery is not in the record, but a laminectomy generally removes a portion of a vertebrae called the lamina to relieve pressure on spinal nerves. *See Stedman's Medical Dictionary* 964 (2000). Mr. Little testified that he had a second back surgery after the laminectomy, but we have no records of that procedure.

[¶9]   Following the surgery, Mr. Little continued to report persistent pain and discomfort in his lower back, buttocks, and right thigh. However, Dr. Snider's post-operative notes indicated that a magnetic resonance imaging study "looks fairly good," and that "he is doing really pretty well." Dr. Snider also noted that Mr. Little continued to display exaggerated responses.

[¶10] Dr. James Lovitt, another orthopedic surgeon with Dr. Snider's practice, performed a comprehensive physical exam in August of 1989, and found as follows:

> Overall . . . he had no motor function loss with determined testing. Sensory exam revealed paresthesia production [a sensation of numbness or tingling in the skin] in the medial leg below the knees and the dorsal feet. Otherwise, sensory exam was unremarkable. Indirect straight leg raising is unremarkable. Hamstrings are right. Supine straight leg

---

[1] Some of the notes indicate that the surgery was performed by another physician associated with Dr. Snider's office.

raising produces no symptoms. . . . Looking for motor point tenderness in the calves elicited some "tenderness in my calves", however this is not really impressive. . . . There is no atrophy. . . . Hips and SI joints unremarkable.

[¶11] Dr. Lovitt concluded that Mr. Little "has a plethora of nonorganic findings and an abnormal pain diagram suggestive of an associated perceptual disorder." He recommended a lower back brace and believed Mr. Little could benefit from vocational rehabilitation which would train him for lighter duty work.

[¶12] Mr. Little reached maximum medical improvement in September of 1990 and received a 27% whole body impairment award for his lower back injury shortly thereafter. The record does not reflect any medical treatment for nearly seven years. However, from March of 1997 through December of 2000, his orthopedists noted several complaints of neck pain, lower back pain, difficulty walking, and pain in his right leg. Their overall clinical impression was of cervical spondylosis[2] and severe degenerative disc disease at the L4-L5 level of the lower back. A physical examination indicated normal reflexes at the knee level, but also a "giving way type of resistance in the lower extremities" during strength testing.

[¶13] Mr. Little began seeing Dr. Kirtikumar Patel in July of 2003. Dr. Patel is board-certified in internal medicine rather than orthopedics. Dr. Patel initially noted as follows:

> No obvious muscle wasting. . . . Straight leg raising testing would increase the pain in the low back. Internal and external rotation of the hip joint was normal. Movements of the knees and the ankles were normal. The patient had significant pain the low back and the paraspinal muscles. The patient had a difficult time standing on one foot at a time. Gait was very slow and deliberate, trying to fail with the right side.

Dr. Patel noted complaints of right leg pain in February of 2006, along with difficulty with walking and driving long distances. However, Dr. Patel also reported that hip and knee movements were normal bilaterally, and that Mr. Little's gait was normal.

[¶14] In January of 2007, Dr. Patel diagnosed "developing problems in the right hip area and possible osteoarthritis." X-rays of Mr. Little's right hip were taken, and the radiologist who read them reported "[d]egenerative changes of the hip joints as noted,

---

[2] Age-related wear and tear of the spinal discs in the neck. *Cervical Spondylosis*, MayoClinic.com, http://www. mayoclinic.com/health/cervical-spondylosis/DS00697.

right greater than left." Dr. Patel's review of the x-rays also indicated "osteoarthritis, more on the right than the left."[3]

[¶15] Mr. Little was admitted to the Campbell County Memorial Hospital for hip pain in April of 2009. X-rays were taken, and the radiologist's report indicated the following:

> FINDINGS: AP view of the pelvis is compared with a prior examination from February 2007. There are now more advanced arthritic changes of the right hip joint and buttressing of the femoral neck when compared to that study. . . . Mild to moderate degenerative changes of the left hip joint are noted as well and are stable to slightly more prominent.
>
> .   .   .
>
> IMPRESSION:
>
> 1. Degenerative changes in the lower lumbar spine, and pronounced arthritic changes of the right hip, progressing from 2007 study, as well as mild to moderate arthritic changes of the left hip.

Following a physical examination and review of x-rays, an emergency room physician noted "back and right lower extremity pain, greater than left lower extremity pain with degenerative changes . . . ."

[¶16] In February of 2008, Dr. Patel reported that "the patient has also developed significant osteoarthritis, probably because of overcompensation. . . . He may eventually need a total hip replacement." A progress note from March of 2009 likewise indicated that Mr. Little complained of right leg pain, and that he walked with "a wobbly gait favoring the right leg." However, Dr. Patel also noted that Mr. Little was able to stand without difficulty, and that his right hip, knee, and ankle had normal stability.

[¶17] Mr. Little returned for another visit with Dr. Patel on February 11, 2010. Dr. Patel's notes from that visit indicated decreased stability, restricted range of motion, and tenderness to palpation with the right hip. Dr. Patel's overall assessment indicated the following:

---

[3] The Division asked Dr. Patel for information on whether "the current right hip treatment is related to the original work injury" in April of 2007. The record is unclear on whether Dr. Patel provided this information, but the Division did not object to paying for Mr. Little's medical treatment at that time.

[O]steoarthritis in both hips more on right than left now has muscle wasting and weakness of the right leg leading to decreased ambulation and drags his right leg when walking[.] I think the hip has been damaged from his compensation for his back pain over the years and he had some injury at the time of accident to the hip . . . . [H]e will check with Worker's Comp possible surgery that he might need for right hip replaced.

Dr. Patel also advised Mr. Little to see an orthopedic surgeon about a hip replacement.[4]

[¶18] Mr. Little saw Dr. Patel again on September 14, 2010. Dr. Patel noted continued overcompensation and severe osteoarthritis, and again recommended a total hip replacement. Dr. Patel billed the Division $87.00 for the visit, but the Division denied payment, evidently anticipating a much larger claim for the hip replacement and perhaps an argument that by paying this small bill it had found Mr. Little's need for a hip replacement to be related to his compensable injury years before. It issued a final determination stating that "[t]he bilateral hip osteoarthritis is not related to the originial [sic] work injury." Mr. Little requested a contested case hearing, and the matter was referred to an OAH hearing examiner.

[¶19] In February 2011, orthopedic surgeon Richard E. Torkelson performed an independent medical evaluation at the Division's request. Dr. Torkelson reviewed Mr. Little's medical records and radiographic studies. He also conducted a physical examination which included the taking of a history, a neurovascular exam of the lower extremities, and range of motion testing of the lower extremities. He ultimately concluded that Mr. Little's right hip problems were unrelated to the original work injury:

> The diagnosis is severe degenerative arthritis, bilateral hips, right greater than left. My recommended treatment plan would be total hip arthroplasty[5] starting on the right side.
>
> With regard to the specific questions posed;
>
> 1. The bilateral hip care and treatment/interventions are not related to the original work injury of 1988. My reasoning for coming to this conclusion is that in my review of the

---

[4] The Division objected to payment for this visit, stating that this treatment was unrelated to the original work injury. It later withdrew its objection but reserved its right to dispute further claims. Both parties agreed at the contested case hearing that the Division's payment for earlier visits would not have a preclusive effect on later claims.

[5] Hip replacement. *See Stedman's Medical Dictionary* 150 (2000).

5

exhaustive records provided by your office, he saw multiple physicians including several orthopedic surgeons, as well as neurosurgeons in the period from 1988 forward and hip osteoarthritis was not diagnosed until January of 2007, 19 years later. The note from Gillette Internal Medicine Associates [Dr. Patel] dated July 29, 2007, indicates that the patient told the examiner that he began experiencing pain in the right hip three months prior to the January 29, 2007 visit. The patient advised me that he had had pain in both lower extremities and this is well documented, but the diagnosis during that period of time was not related to hip arthritis, but rather radiating pain from his lumbosacral injury. **In summary, there is no evidence of diagnosis of osteoarthritis of his hips at any time during multiple physician visits from 1988 to 2007. It is my opinion, to a degree of medical probability, that the current osteoarthritis is completely unrelated to his injury. Osteoarthritis in a person of his age is not unusual in the absence of any injury.**

2. Utilizing the same reasoning, it is my opinion that the proposed right total hip arthroplasty is not directly related to the original work injury of 1988 and the left hip osteoarthritis is also not directly related to the original work injury of 1988.

(Emphasis added.)

[¶20] Dr. Patel was deposed shortly before the contested case hearing. He testified to his qualifications as a board-certified internist, and that he regularly deals with arthritis, sprains, strains, and chronic pain in adults. When he began seeing Mr. Little in 2003, he was unaware of any hip problems and only knew that Mr. Little had chronic pain. Mr. Little did not display any symptoms of hip pain during his first visit, but Dr. Patel testified that the osteoarthritis could have been in an early and less symptomatic stage at that time. Dr. Patel could not obtain any previous medical records, and he felt that the results of his initial examination did not warrant a more comprehensive workup.

[¶21] Dr. Patel testified that he began treating Mr. Little for osteoarthritis of the right hip joint in 2007. He described osteoarthritis as "basically a wear-and-tear of the joint" which can be caused by normal aging over time, a specific injury to that joint, or overcompensation due to other injuries. However, he testified that "there is no specific test, no specific exam or no specific time to tell where this [osteoarthritis] came from or how it came. It's a clinical diagnosis and a clinical impression."

6

[¶22] Dr. Patel testified as follows about the cause of Mr. Little's osteoarthritis:

A. . . The patient had also developed significant osteoarthritis, **probably** because of over-compensation from his previous injuries. . . .

.   .   .

Q. . . . Does that remain your opinion today?

A. . . . In my clinical judgment, yes, that is a **possible** outcome of his injuries. . . .

.   .   .

. . . I was not privy to his actual injury initially, what was done. So . . . whether he had initial injuries to the hip area, I don't know.

.   .   .

But from my four, five years of seeing him, my impression was that, yeah, he was developing osteoarthritis and most commonly **probably** related to his other previous injuries and his ongoing problems.

.   .   .

So when you either put more weight on the right hip joint all of the time, or if you just stand in a certain way all the time, or if that caused the overuse leading it to osteoarthritis.

Q. And based on your training and experience and with a reasonable degree of medical probability, is it your opinion that that's what happened to Marshall?

A. **That's what I think**, yes.

.   .   .

Q. . . . [D]o you feel that Marshall's current right hip treatment is related to his original work injury?

A. It **possibly** still is, because in this letter [the 2007 request for information from the Division] it says that he has some pain in the right leg since this accident . . . maybe those same symptoms have **probably** progressed.

Q. And, again, your opinion as you've described earlier is that the symptoms that he's having and the problems that he's having in his right leg are probably related to his original work injury?

A. **Possibly.**

Q. Possibly?

A. Yes.

(Emphasis added.)

[¶23] Cross-examination by the Division's attorney established that Mr. Little was obese and that he smoked cigarettes. Dr. Patel testified that he was unfamiliar with any correlation or studies linking osteoarthritis to smoking or obesity. However, he acknowledged his limited expertise in this area: "[Y]ou can ask the orthopedist, because they do deal with the final outcome of whatever etiology is of the osteoarthritis and if needing a replacement or surgery, because we [internists] usually just treat the symptoms. We don't intervene any surgery." Dr. Patel also testified that "[i]t's really difficult to put a timeline once you find arthritis," and that an orthopedist could answer questions about the onset of hip arthritis due to prior injuries.

[¶24] Mr. Little was the only witness who testified in person at the contested case hearing. He indicated that before his 1988 injury he was physically active and had no hip pain. He immediately felt pain to his lower back and down through his legs after being drawn into the hot mix plant chute. He testified that he had hip pain soon after the accident, but that he assumed that physical therapy would help. He also "walk[ed] weird," favoring his right leg, and he fell down several times before his first back surgery.

[¶25] Mr. Little testified that he actually had two surgeries to his back and one to his neck in the late 1980s and early 1990s. He acknowledged that his back surgeries relieved his leg pain and weakness. He used a cane after his first surgery, but he eventually felt better and became more mobile from 1991 through 2001. He still walked with a limp and favored his right leg during this period. However, from 1992 through 1995, he "could almost get a normal stride," and only used his cane as a stabilizer during the winter

months. Mr. Little also testified that he did not see any doctors about his injury from 1990 through 1997.

[¶26] Mr. Little began seeing Dr. Patel for pain management in 2003. He acknowledged that he had not been diagnosed with osteoarthritis in his hip before 2007. However, he claimed that he had hip pain well before 2007. He saw Dr. Patel for hip pain because "the pain . . . was becoming more than I could deal with."

[¶27] The hearing examiner issued a written order denying benefits for treatment of hip osteoarthritis, concluding as follows:

> [I]t is the Claimant's contention that he either sustained an initial injury to his hip and, as a result, developed osteoarthritis in his hip requiring hip replacement surgery or, in the alternative, the Claimant contends that the osteoarthritis developed as a result of a change in gait due to his lower back injury and, therefore, he sustained a second compensable injury. As to the contention that the Claimant sustained an injury to his hip in 1988, the medical records do not support such a contention [reference to several medical records]. . . . The Office finds that this evidence does not indicate that the Claimant sustained any specific injury to his hip in 1988 and that the degenerative osteoarthritis developed over time for some other reason. The question then becomes whether the Claimant's degenerative osteoarthritis which occurred over a substantial period of time was as a result of his initial work-related injury. As an injury which occurs over of a substantial period of time, it is the Claimant's burden to prove by competent medical authority that his degenerative condition was directly as a result of his initial compensable injury. The Claimant contends that he has met such burden through the testimony of Dr. Patel. . . . In his deposition, Dr. Patel acknowledges the contents of his medical records; however he is then specifically asked as to whether or not he felt the Claimant's right hip treatment is related to his original work injury. He specifically responds, "It possibly still is, because in this letter it says that he has some pain in the right leg since this accident, and this was 2007; so it's almost about four years, four-and-a-half years since that. And maybe those same symptoms have probably progressed." Dr. Patel is again asked whether the Claimant's symptoms and the problems he is having with his right leg are probably related to his original work injury. Again, his response, "Possibly."

9

The Office finds that such testimony does not satisfy the Claimant's burden of proof to show a causal relationship as required under the law, especially in view of the medical opinion provided by Dr. Torkelson. . . . [T]he Office must find Dr. Torkelson's opinions more probative in this matter.

The district court affirmed, and this appeal followed.

## STANDARD OF REVIEW

[¶28]  We review an agency's findings of fact arising from a contested case hearing for substantial evidence:

> Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. When the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole.

*Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 8, 301 P.3d 137, 141 (Wyo. 2013) (citations omitted); *see also* Wyo. Stat. Ann. § 16-3-114(c)(ii)(E) (LexisNexis 2013); W.R.A.P. 12.09.  We defer to the agency's (or the hearing examiner's) determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence.  *Willey v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 144, ¶ 20, 288 P.3d 418, 427 (Wyo. 2012) (quoting *Beall v. Sky Blue Enters.*, 2012 WY 38, ¶ 28, 271 P.3d 1022, 1034 (Wyo. 2012)).  We also accord "no special deference to the district court's decision and . . . consider the case as if it came directly from the agency."  *Decker v. State ex rel. Workers' Safety & Comp. Div.*, 2013 WY 75, ¶ 7, 303 P.3d 1134, 1136 (Wyo. 2013) (quoting *In re Jensen*, 2001 WY 51, ¶ 9, 24 P.3d 1133, 1136 (Wyo. 2001)).

## DISCUSSION

[¶29]  The Wyoming Worker's Compensation Act (the Act) defines a compensable injury as one "arising out of and in the course of employment."  Wyo. Stat. Ann. § 27-14-102(a)(xi) (LexisNexis 2013); *Perry v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 61, ¶ 12, 134 P.3d 1242, 1246 (Wyo. 2006).  We explained long ago that the

"arising out of" language of § 102(a)(xi) requires there to be a "causal connection[,] . . . a nexus between the injury and some condition, activity, environment or requirement of the employment." *Matter of Willey*, 571 P.2d 248, 250 (Wyo. 1977) (citation omitted); *see also Shelest v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 3, ¶ 8, 222 P.3d 167, 170 (Wyo. 2010); 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 3.01 (2013). Consistent with this requirement, the Act excludes from coverage "[a]ny injury resulting primarily from the natural aging process or from the normal activities of day-to-day living, as established by medical evidence supported by objective findings." § 27-14-102(a)(xi)(G); *Shepherd of Valley Care Ctr. v. Fulmer*, 2012 WY 12, ¶ 33, 269 P.3d 432, 442 (Wyo. 2012).

[¶30] A single work accident can give rise to more than one compensable injury. *In re Kaczmarek*, 2009 WY 110, ¶ 9, 215 P.3d 277, 281 (Wyo. 2009) (citation omitted). The second compensable injury rule allows recovery when "an initial compensable injury ripens into a condition requiring additional medical intervention." *Id.* (quoting *Yenne–Tully v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 12 P.3d 170, 172 (Wyo. 2000)). However, a subsequent injury or condition is compensable only if it is causally related to the initial compensable injury. *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶ 9, 291 P.3d 297, 301 (Wyo. 2012) (quoting *Rogers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 117, ¶ 14, 284 P.3d 815, 819 (Wyo. 2012)); *see also Ball v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 128, ¶ 25, 239 P.3d 621, 628 (Wyo. 2010) ("[T]he second compensable rule is a causation analysis . . . ."). We apply the second compensable injury rule in cases where the claimant's injury "was precipitated by a single, identifiable incident," and reject the application of Wyoming Statute § 27-14-603 (burden of proof for injuries occurring over a substantial period of time) in such cases. *Yenne-Tully*, 12 P.3d at 172.[6]

[¶31] The hearing examiner had to decide whether the osteoarthritis in Mr. Little's hip was causally related to the compensable injury he suffered in 1988. Mr. Little advanced two alternative but related theories of recovery. He contended that he either directly suffered a hip injury in the work accident, or that his osteoarthritis was a second compensable injury because it was caused by the need to compensate because of injury resulting from his original injury. The hearing examiner rejected both theories. He found

---

[6] The hearing examiner actually cited to two different legal standards in his final order: the second compensable injury rule, and the higher burden of proof required under § 27-14-603 for an injury occurring over a substantial period of time. Mr. Little's condition falls under the second compensable injury rule because there was "a definite triggering accident or event," and § 27-14-603 was therefore inapplicable to this case. *See Yenne-Tully*, 12 P.3d at 172. However, the hearing examiner ultimately applied the correct legal standard when he held that the weight of the evidence failed to support a causal link between the hip condition and the original work injury. We therefore view any incidental misstatement of the law as harmless error. *See* W.R.A.P. 9.04 (reviewing court disregards any error, defect, irregularity or variance which does not affect substantial rights).

that the medical records did not support a direct theory of causation, and that Mr. Little failed to prove that the arthritis in his hip was caused by overcompensation.

[¶32] Mr. Little argues that the hearing examiner's application of the second compensable injury rule is contrary to the overwhelming weight of the evidence in the record.[7] He contends that Dr. Patel's testimony and his own medical history established a sufficient causal link between the original work injury and osteoarthritis caused by a change in gait and overcompensation. Mr. Little also claims that the hearing examiner improperly relied upon Dr. Torkelson's opinion that the osteoarthritis in his hip was unrelated to the 1988 accident. He argues that the examiner should have relied on his treating physician's testimony as to the causation of the hip condition rather than Dr. Torkelson's report.

[¶33] In a contested case hearing for worker's compensation benefits, the claimant bears the burden of proving all of the essential elements of the claim by a preponderance of the evidence, including proof of a causal connection between a work-related incident and his injury. *See, e.g., Jacobs*, ¶ 11, 301 P.3d at 141 (citation omitted); *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (citation omitted); *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Conner*, 12 P.3d 707, 709 (Wyo. 2000) (citation omitted); 8 Larson, *supra*, § 130.06[3][b]. This is true whether a claimant is seeking recovery under a direct theory of causation or the second compensable injury rule. *Hoffman*, ¶ 9, 291 P.3d at 301. In order to receive benefits under the second compensable injury rule, Mr. Little therefore had to prove that his back injury caused or "ripened into" a hip condition requiring additional medical intervention. *See id.* at 302.

[¶34] The burden of proof consists of two elements, the burden of production and the burden of persuasion. *Bando v. Clure Bros. Furniture*, 980 P.2d 323, 330 (Wyo. 1999); 1 Christoper B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* §§ 3:4, 3:5 (3d ed. 2007). The burden of production is also known as "the burden of producing evidence or going forward with the evidence," and it "involves the obligation of a party to present, at the appropriate time, evidence of sufficient substance on the issue involved to permit the fact finder to act upon it." *Joyner v. State*, 2002 WY 174, ¶ 18, 58 P.3d. 331, 337 (Wyo. 2002) (citation omitted); *see also* 1 Mueller and Kirkpatrick, *supra*, § 3:4. The burden of

---

[7] Little does not challenge the hearing examiner's finding that his hip was not directly injured in the workplace accident. We agree with the Division that we should not consider that aspect of the agency's final order. *See Ferrell v. Knighten*, 2013 WY 37, ¶ 12, 298 P.3d 161, 163 (Wyo. 2013) ("Since Ultra failed in its opening brief to designate or argue the issue of the propriety of the holding by the district court that it contractually waived its right to seek judicial review of the arbitration award, the holding is uncontested." (quoting *Ultra Resources, Inc. v. McMurry Energy Co.*, 2004 WY 121, ¶ 13, 99 P.3d 959, 964 (Wyo. 2004))); *State v. Campbell Cnty. School Dist.*, 2001 WY 90, ¶ 35, 32 P.3d 325, 333 (Wyo. 2001) ("Under this court's long-standing precedent, this court will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.").

persuasion is "the burden of persuading the trier of fact that the alleged fact is true." 2 *McCormick on Evidence* § 336, at 664 (7th ed. 2013); *see also Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 268, 114 S. Ct. 2251, 2253, 129 L. Ed. 2d 221 (1994); *Hansen v. State*, 904 P.2d 811, 823-24 (Wyo. 1995); 1 Mueller and Kirkpatrick, *supra*, § 3:5.

[¶35]   A claimant produces sufficient evidence of causation to meet his burden of production when "the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury." *Anastos*, ¶ 20, 120 P.3d at 666 (quoting *Hall v. State ex rel. Wyo. Workers Comp. Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo. 2001)).   "Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard." *Id.*

[¶36]   Dr. Patel testified that Mr. Little "was developing osteoarthritis  .  .  .  most commonly **probably** related to his other previous injuries," and that he "developed significant osteoarthritis, **probably** because of over-compensation from his previous injuries." (Emphasis added.)   Dr. Patel also testified that Mr. Little's change in gait caused overuse of the right leg and osteoarthritis within a reasonable degree of medical probability, and that he believed the right hip had been damaged from compensation for back pain over the years.   Dr. Patel's notes from February 2008 likewise indicated that Mr. Little "developed significant osteoarthritis, **probably** because of overcompensation." (Emphasis added.)   Mr. Little therefore produced sufficient evidence of causation to meet the burden of going forward as to his claim for benefits under the second compensable injury rule.

[¶37]   Mr. Little also bore the burden of persuasion, *i.e.*, the obligation to persuade the hearing examiner that his hip condition was in fact causally connected to his original back injury in the face of conflicting testimony.   This can be a difficult burden to overcome in some instances:

> The finder of fact is not necessarily bound by the expert medical testimony. . . . It is the hearing examiner's responsibility, as the trier of fact, to determine relevancy, assign probative value and ascribe the relevant weight given to medical testimony.   The hearing examiner is also in the best position to judge the weight to be given to the medical evidence.  The trier of fact may disregard an expert opinion if he finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based.
>
> In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given

for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it. Demonstrating evidentiary contradictions in the record does not establish the ruling was irrational, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it.

*Anastos*, ¶ 20, 120 P.3d at 666 (citations omitted) (internal quotation marks omitted). *See also Casper Iron & Metal, Inc. v. Unemp't Ins. Comm'n*, 845 P.2d 387, 393 (Wyo. 1993) ("[I]f the party with the burden of persuasion has not sustained it by a fair preponderance of the evidence—if the evidence is in equipoise or the opposing party's preponderates— the party with the burden must fail." (quoting 1 D. Louisell & C. Mueller, *Federal Evidence* § 66 (1977))).

[¶38]  The record contains conflicting evidence as to causation.  Some conflict can be found within Dr. Patel's deposition.  As we have already observed, his testimony satisfied Mr. Little's burden of producing evidence which could have supported a decision in his favor.  However, as the hearing examiner pointed out, Dr. Patel weakened that opinion with the repeated use of qualifying language like "I think," and "possibly."  Dr. Patel is an internist, meaning that he treats arthritic joints as part of his general practice, and he does not specialize in diagnosis and treatment of diseases, injury, or degeneration of the body's skeletal system or perform surgery to  correct these conditions, as orthopedic surgeons do.

[¶39]  On the other hand, Dr. Torkelson's report indicates that there was no connection between the work injury and the arthritic hip joint.   Dr. Torkelson is an orthopedic surgeon who specializes in treatment of musculo-skeletal problems and performs surgical procedures such as hip replacements.  Dr. Patel acknowledged that an orthopedic surgeon would be better equipped to answer questions about the general timeline and risk factors involved with arthritis.   Dr. Torkelson's report did just that, concluding that "[o]steoarthritis in a person of [Mr. Little's] age is not unusual in the absence of any injury."  He also noted "no evidence of diagnosis of osteoarthritis of his hips at any time during multiple physician visits from 1988 to 2007."  The hearing examiner was entitled to believe Dr. Torkelson over Dr. Patel, because Dr. Patel was less qualified to testify about the onset of arthritis by his own admission, and because Dr. Patel diluted his testimony by the use of qualifying language.

[¶40]  The hearing examiner was also entitled to discount Mr. Little's testimony that the onset of his hip condition was much earlier.  The medical records indicate that he had complaints of right leg pain as early as December of 1988.  However, these reports are undercut by repeated findings of exaggerated responses and symptom magnification.  Also, as Dr. Torkelson pointed out, nearly twenty years transpired between the original

14

accident and the diagnosis of hip osteoarthritis. Substantial evidence supports the hearing examiner's decision that Mr. Little failed to prove a causal link between his original work injury and the onset of the osteoarthritis in his hip.

## CONCLUSION

[¶41] Mr. Little met his burden of producing competent evidence to demonstrate a causal link between his compensable work injury and the arthritis in his hip nearly twenty years later. However, he failed to carry the burden of persuasion because the hearing examiner chose to believe the report of an orthopedic surgeon, which found no causal link between the original injury and the arthritis in his hip. Substantial evidence supports the hearing examiner's findings. Affirmed.