# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 87

### APRIL TERM, A.D. 2016

### August 30, 2016

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF TODD JENSEN,
AN EMPLOYEE OF R.S. BENNETT
CONSTRUCTION:

TODD JENSEN,

Appellant
(Petitioner),

v.

No. S-16-0017

STATE OF WYOMING, ex rel., DEPARTMENT
OF WORKFORCE SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Sublette County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellant:*
　　Jack D. Edwards of Edwards Law Office, P.C., Etna, Wyoming.

*Representing Appellee:*
　　Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney
　　General; Michael J. Finn, Senior Assistant Attorney General; Kellsie J. Singleton,
　　Assistant Attorney General.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   The Office of Administrative Hearings (OAH) denied Mr. Jensen's worker's compensation claim on the grounds that he failed to prove a causal relationship between his automobile accident and his prior work-related accident.  The district court upheld that decision.  We affirm.

*ISSUES*

[¶2]   1.   Did the OAH properly apply the second compensable injury rule?

  2.   Was the OAH's conclusion that Mr. Jensen did not prove by a preponderance of the evidence that his automobile accident was causally connected to his work-related injury supported by substantial evidence?

*FACTS*

[¶3]   On October 13, 2011, Mr. Jensen suffered a work-related injury when he climbed from the bed of a dump truck and fell onto a rock, fracturing his right hip.  Dr. Brian Tallerico performed surgery on the hip, inserting a nail into the femur to repair the fracture.  The Department of Workforce Services, Workers' Compensation Division (the Division) approved benefits for the injury to Mr. Jensen's right hip.

[¶4]   After surgery, Mr. Jensen's legs were different lengths, causing a limp and constant pain in both hips.  The pain eventually became unbearable, and on July 12, 2012, Dr. Tallerico and Dr. Aaron Altenburg performed a total hip replacement in Pocatello, Idaho.  After his hip replacement, Mr. Jensen remained in pain, had bursitis, and was pigeon-toed.  This caused him to trip and fall down when he walked.

 [¶5] Mr. Jensen sought treatment for the symptoms he was experiencing.  He began seeing pain specialist Dr. Holly Zoe in Idaho Falls, Idaho.  He also revisited Dr. Tallerico, with whom he discussed the possibility of returning to work and the performance of a functional capacity evaluation and an impairment rating examination, which were subsequently scheduled.  Dr. Tallerico noted: "Musculoskeletal: gait and station–[c]onventional walking: abnormal toe off."  He performed an impairment rating examination in April of 2013.  During that examination, Dr. Tallerico noted:

> **Gait Observation**: He ambulates with an antalgic gait favoring the right lower extremity with a shortened swing phase and stance phase.  It is not a true Trendelenburg appearance however.  Overall it does not appear that he has excessive external or internal rotation of the right lower extremity.

1

. . . .

Manual motor testing however does reveal some give way weakness in basically all major motor groups in the right lower extremity.

. . . .

It is my opinion that the claimant is now at maximal medical improvement related to this industrial injury and he should be considered fixed and stable at this time.

I am also of the opinion that Mr. Jensen does have permanent work restrictions related to the industrial injury. I believe that this individual has a sincere desire to return to work but given his prior heavy requirements I doubt he can return to the job of injury . . . .

[¶6]    On June 3, 2013, Mr. Jensen notified the Division that he was having difficulty walking because his pigeon-toed foot was causing him to fall and that he was going to see Dr. Tallerico about it. On June 5, he followed up with Dr. Tallerico. During that visit, according to Dr. Tallerico's notes, Mr. Jensen "state[d] that he has a hard time walking as right foot [wants] to roll [] underneath him and [is] pigeon toe[d] to where he trips over and [falls]." Regarding Mr. Jensen's physical examination, Dr. Tallerico's notes state:

The patient['s] examination is quite interesting. As he sits in the examination chair [it] appears that he does have inversion and internal rotation of his right foot. However with distraction this is not the case[.] [W]hen I inspected his shoes there is no evidence of a [un]even wear pattern on the right shoe sole. He ambulates with a slight limp as he always [is] favoring the right lower extremity[.] [H]is supine exam shows basically even limb length and with distraction and log-rolling of his legs there is essentially no evidence of any malrotation of his right lower extremity due to malposition of his total hip implant. In fact in the supine position. [sic] This is confirmed whereas [h]is foot progression angle is actually symmetric. His hip range of motion is actually quite impressive and symmetric with no abnormal findings on the right side [and] no evidence of impingement[.]

2

Dr. Tallerico's notes go on to state:

> [Mr. Jensen's] clinical symptoms are somewhat perplexing to me. He seems to feel that he has significant internal rotation and intoeing of the right lower extremity but I cannot find any objective evidence to support that on exam . . . . However I certainly have to take [Mr. Jensen's] subjective complaints into consideration so therefore we are going to have him see the Ortho [tech] in Pocatello on the same day to give him a lateral heel wedge for his right shoe orthotics to see if that will help neutralize his foot[.]

[¶7]   On June 10, Mr. Jensen saw Dr. Altenburg and his assistant, Matthew McKinlay, PA-C. Mr. McKinlay's notes state that Mr. Jensen "complains of soreness in his lateral hip that has caused him to walk with pinching toe gait and he is also starting to go over the lateral aspect of his foot." The physical examination revealed the following:

> Certainly, he does walk with his foot internally rotated and seems to thrust his weight laterally. He has marked tenderness at the greater trochanter. When his leg is relaxed in extension, he externally rotates to a neutral position and the pain resolves.

The note concluded that Mr. Jensen "has developed greater trochanteric bursitis and intoeing." Going forward, their plan was to "get [Mr. Jensen] set up for some gait training and physical therapy focusing on externally rotating the foot and leg to get into more of a neutral alignment."

[¶8]   The day after Mr. Jensen saw Dr. Altenburg, he was scheduled for appointments with Idaho Prosthetics & Orthotics to be fitted with orthotics, and with East Idaho Interventional Pain Center. En route to those appointments, Mr. Jensen was in an automobile accident which resulted in a shattered right ankle, broken left arm, and a broken pelvis.

[¶9]   Immediately before the accident, Mr. Jensen was traveling north on Highway 89. As he approached the bridge over the Salt River, the vehicle in front of him began to turn right onto Lincoln County Road 128, and Mr. Jensen slowed down to allow room for the vehicle to turn. At the hearing, Mr. Jensen testified regarding what happened next:

> A.   [Mr. Jensen:] Okay. There's a vehicle in front of me a quarter mile ahead of me. I'm -- I'm going well under the speed limit. I put my left foot up on the clutch, pushed it in and shifted down. I needed to slow the pickup down. I put my right foot up on the brake pedal.

3

Q. [Counsel for Mr. Jensen:] Why are you slowing your vehicle down?

A. Just to make sure I give him enough room to make his turn.

. . . .

So, I put my right foot up, my pigeon toed foot up on the pedal, and it did what it does when I walked, it rolled off the pedal and down between the gas pedal and the brake pedal. And instead of being straight it's, like I say, pigeon toed. And I reached down with my leg tried to pull it out. Couldn't get it to come.

I glanced down to see what I needed to do to get it out, and when I glanced back up, there was a bridge abutment right in front of me.

I made a hard left. I heard a bunch of crunching sound, thought I had made it out of it, and thought that maybe I just crunched in the side of my pickup was going through my head, and thinking, Oh, boy. Because it was a nice little pickup, and it was in very good shape for how old it was.

And I was thinking, Oh boy. And right at the moment I'm thinking this, boom, I'm upside down twirling on my roof, and I twirled across the road, hit the curb on the other side of the bridge, and it bounced me back to the northbound lane. That's where it spun to a stop.

Q. So during this time when this -- when your vehicle crashed, where was your right foot?

A. It was in between the gas pedal and the clutch or the brake pedal, I'm sorry.

[¶10] Immediately after the accident, UPS driver John Pittman arrived on the scene and helped Mr. Jensen out of his truck. Mr. Jensen laid his head on Mr. Pittman's lap until the ambulance arrived. At that time, he also called his wife from his cell phone. Mrs. Jensen testified that he spoke to her on the phone and told her that the accident happened when his foot got lodged between the brake and gas pedals and he could not get it out.

4

[¶11] An ambulance transferred Mr. Jensen to the Star Valley Medical Center, and he was ultimately life-flighted to the University of Utah Hospital in Salt Lake City, Utah, where he received treatment for his injuries. The Division denied Mr. Jensen's request for worker's compensation benefits for the injuries sustained in the automobile accident. After a contested case hearing, the OAH again denied his request. Mr. Jensen appealed that decision to the Sublette County District Court, which affirmed the OAH's decision. Mr. Jensen timely filed this appeal.

### STANDARD OF REVIEW

[¶12] Our standard of review of a district court's review of an administrative agency's decision in worker's compensation cases is:

> When an appeal is taken from a district court's review of an administrative agency's decision, we examine the case as if it had come directly from the agency without giving any deference to the district court's decision. *Dutcher v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 10, ¶ 9, 223 P.3d 559, 561 (Wyo. 2010); *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008). Our review is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2013) . . . .

*Guerrero v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2015 WY 88, ¶ 11, 352 P.3d 262, 265 (Wyo. 2015).

[¶13] We review the agency's findings of fact by applying the substantial evidence standard. Wyo. Stat. Ann. § 16-3-114(c)(ii)(E) (LexisNexis 2015); *see also Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008).

> Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. State ex rel. Wyo. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005) (citation omitted). *See also Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Id.*, ¶ 11, 247 P.3d at 849 (citation omitted).

When an agency rules that the claimant did not satisfy his burden of proof, we apply the following standard:

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale*, ¶ 22, 188 P.3d at 561 (citations omitted).

*Guerrero*, 2015 WY 88, ¶¶ 12-13, 352 P.3d at 266.

[¶14] We review an agency's conclusions of law de novo, and will affirm those conclusions only when they are in accordance with the law. *Id.*, 2015 WY 88, ¶ 14, 352 P.3d at 266 (citing *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 13, 259 P.3d 1161, 1164 (Wyo. 2011)).

### *DISCUSSION*

### I. *Did the OAH properly apply the second compensable injury rule?*

[¶15] Mr. Jensen argues that the Hearing Examiner failed to properly apply the second compensable injury rule. Mr. Jensen takes issue with the Hearing Examiner's comments that he had failed to pursue the "but for" theory of analysis. The Hearing Examiner stated: "Jensen has alleged only that the residual injuries caused the automobile accident. He has not alleged a theory, similar to that of *In re Fisher* [*Fisher v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2008 WY 89, 189 P.3d 866 (Wyo. 2008)] that 'but for' the work related accident he would not have suffered the degree of injuries he did in the automobile accident." She also stated that "[t]he court in *Fisher* and *Alvarez* [*v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 126, 164 P.3d 548 (Wyo. 2007)] found in both cases that 'but for' the work related injuries the subsequent injuries would

6

not have occurred," and that "Jensen has not alleged or attempted to prove that 'but for' his prior work related injury he would not have suffered the same or as severe of injuries in the car accident." Although Mr. Jensen is correct that the "but for" analysis does not govern the determination of a second compensable injury, the evidence shows that the Hearing Examiner applied the correct standard in reaching her conclusion.

[¶16] To qualify for worker's compensation, an employee must show that he suffered a compensable injury. *Guerrero*, 2015 WY 88, ¶ 15, 352 P.3d at 266. An "injury is not compensable if it cannot fairly be traced to the employment as a contributing cause and if it comes from a hazard that the employee would have been equally exposed to outside of the employment." *Ball v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 128, ¶ 23, 239 P.3d 621, 628 (Wyo. 2010) (citing *Finley v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 46, ¶ 8, 132 P.3d 185, 188 (Wyo. 2006) (quoting *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Bruhn*, 951 P.2d 373, 377 (Wyo. 1997)).

[¶17] The second compensable injury rule applies when "an initial compensable injury has resulted in an injury or condition that requires additional medical intervention." *Ball*, 2010 WY 128, ¶ 24, 239 P.3d at 628. *See also Alvarez*, 2007 WY 126, ¶ 18, 164 P.3d at 552; *Yenne-Tully v. Workers' Safety & Comp. Div.*, 12 P.3d 170, 172 (Wyo. 2000). "Under the rule, a subsequent injury is compensable if it is causally related to the initial compensable work injury." *Alvarez*, 2007 WY 126, ¶ 18, 164 P.3d at 552 (citing *Yenne-Tully*, 12 P.3d at 172); *see also Ball*, 2010 WY 128, ¶ 24, 239 P.3d at 628. In order to prove a second compensable injury, the employee must prove, "by a preponderance of the evidence, that it is more probable than not that there exists a causal connection between the first and second injuries." *Guerrero*, 2015 WY 88, ¶ 29, 352 P.2d at 271 (citing *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Kaczmarek* (*In re Kaczmarek*), 2009 WY 110, ¶ 11, 215 P.3d 277, 282-83 (Wyo. 2009)). In order to establish that causal connection, the employee "must present evidence demonstrating that the initial work injury contributed to the second injury." *Id*. at ¶ 31, 352 P.3d at 271. In *Ball*, we explained the language we have used to describe the rule's causation requirement:

> We have used a number of terms to describe the required causal connection between the first and second injuries including: "direct cause" (*Pino v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 996 P.2d 679, 684 (Wyo. 2000); *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2003 WY 83, ¶ 12, 72 P.3d 799, 803 (Wyo. 2003)); "caused by" (*Casper Oil Co. v. Evenson*, 888 P.2d 221, 226 (Wyo. 1995)); "causally related to" (*Chavez v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 46, ¶¶ 26-27, 204 P.3d 967, 973-74 (Wyo. 2009); *Walsh v. Holly Sugar Corp.*, 931 P.2d 241, 243 (Wyo. 1997)); "direct causal connection" (*Alvarez v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY

7

126, ¶ 17, 164 P.3d 548, 552 (Wyo. 2007)); "direct and natural result" (*Stewart v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 58, ¶ 12, 155 P.3d 198, 203 (Wyo. 2007) (quoting 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 10.10, at 10-2 (2006))); "significant causal connection" and "predominant cause" (*Yenne-Tully v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 90, ¶ 11, 48 P.3d 1057, 1062 (Wyo. 2002)); "fairly be traced to" and "a contributing cause" (*State ex rel. Wyo. Workers' Safety & Comp. Div. v. Bruhn*, 951 P.2d 373, 377 (Wyo. 1997)). Regardless of the terminology used to describe the causal connection, the burden remains the same: the claimant must show, by a preponderance of the evidence, that it is more probable than not that the second injury was caused by the first.

*Ball*, 2010 WY 128, ¶ 24, 239 P.3d at 628 (quoting *Kaczmarek*, 2009 WY 110, ¶ 11 n.3, 215 P.3d at 282 n.3).

[¶18] Here, the Hearing Examiner recognized that the second compensable injury rule applies in this instance. She stated: "This case concerns the second compensable injury rule." She went on to properly identify the relevant issue as "whether [Mr. Jensen's] work related injury caused the accident as he suggests in that due to his work related hip injury his foot was not functioning properly and slipped off the brake pedal and got stuck." She also stated that "[t]he causal connection . . . is dependent upon whether or not the work related injuries were the cause of the accident."

[¶19] The Hearing Examiner then applied the second compensable injury rule, finding that "[w]hile the Office finds and concludes that Jensen did have residual problems from the work related injury, i.e., the in toeing and even rolling of the foot, the Office does not find that the preponderance of the evidence shows that those residual problems were the cause of the automobile accident."

[¶20] The second compensable injury rule was applicable in this case and the Hearing Examiner applied that rule. Therefore, Mr. Jensen's claim that "[t]he wrong rule of law was applied" cannot be sustained.

## II. Was the OAH's conclusion that Mr. Jensen did not prove by a preponderance of the evidence that his automobile accident was causally connected to his work-related injury supported by substantial evidence?

[¶21] Mr. Jensen argues that the OAH's findings were not supported by substantial evidence. As we explained in the preceding section, in order to receive worker's

8

compensation benefits, Mr. Jensen had to prove by a preponderance of the evidence that the injuries he suffered in the automobile accident on June 11, 2013, were causally connected to his 2010 work-related injury. *Guerrero*, 2015 WY 88, ¶ 29, 352 P.2d at 271; *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶ 9, 291 P.3d 297, 301-02 (Wyo. 2012).

[¶22] In his endeavor to make that showing, Mr. Jensen relied on his medical records prior to the accident, testimony of his treating physicians, statements he made immediately after the accident in the presence of Mr. Pittman and to his wife, and his testimony at the hearing before the OAH, as well as his affidavit. That evidence consists of the following:

- February 14, 2013: Dr. Zoe noted a "decreased [range of motion] with right hip flexion, extension, adduction, abduction, internal rotation, and external rotation."
- March 26, 2013: Dr. Tallerico's record shows Mr. Jensen's musculoskeletal evaluation as "gait and station–[c]onventional walking: abnormal toe off." At that appointment Mr. Jensen complained of intoeing.
- April 11, 2013: Dr. Tallerico notes "weakness in basically all major motor groups in the right lower extremity."
- June 3, 2013: Mr. Jensen notified the Division regarding his pigeon-toed foot causing him to fall.
- June 5, 2013: Dr. Tallerico noted Mr. Jensen's right foot wants "to roll [] underneath him and pigeon toe to where he trips over and [falls]." He also described Mr. Jensen's condition in a seated position: "As he sits in the examination chair [it] appears that he does have inversion and internal rotation of his right foot." At this deposition Dr. Tallerico again described his observation: "Well, when he was sitting down, he appeared to invert and internally rotate his right foot, which is basically turning his foot inward." Dr. Tallerico also noted that this rotation was not due to malposition of his total hip implant, recognized his symptoms as "somewhat perplexing" in that he could find no "objective evidence" that would cause the internal rotation and intoeing.
- June 10, 2013: Dr. Altenburg and his assistant note that upon physical examination, Mr. Jensen "does walk with his foot internally rotated" but when his leg is "relaxed in extension, he externally rotates to a neutral position . . . ." They conclude that Mr. Jensen "has developed greater trochanteric bursitis and intoeing."

[¶23] In his deposition, Dr. Altenburg testified regarding hip weakness:

> Q. [State's counsel:] [W]ould an individual have any difficulties in performing any tasks or any movement from a sitting position?

A. [Dr. Altenburg:] A sitting position? You know, generally these abduct -- these muscles work in an abductor function. And just to explain that, if you consider your leg in a midline position, if you bring your leg in towards the opposite leg, that's an a-d-duction, adduction movement. If you take your leg away from midline, or out extended away from the body, that's an abduction . . . motion. . . . [C]ertain seated positions that require you to bring your leg up and take it away from midline may create some difficulty for [Mr. Jensen]. Again, *I'm only surmising that that could cause some weakness* in trying to do some of those things.

. . . .

[If lifting the leg directly off the ground is combined with] moving the leg, per se, out or in an adduction manner, *I could surmise that there may be some weakness or some difficulty with that.*

(Emphasis added.)

[¶24] In his affidavit, Mr. Jensen stated that when he saw the vehicle in front of him, he attempted to slow his truck down:

> When I downshifted, I also applied the brake. Then I felt my foot slip off the brake pedal. I tried to use my right hand to free my foot and was unsuccessful. Then I looked down and saw that my foot was trapped between the brake pedal and the accelerator. I again used my right hand to try to free my right foot and was unsuccessful.

Similarly, at the hearing, Mr. Jensen testified:

> So, I put my right foot up, my pigeon toed foot up on the pedal, and it did what it does when I walked, it rolled off the pedal and down between the gas pedal and the brake pedal. And instead of being straight it's, like I say, pigeon toed. And I reached down with my leg tried to pull it out. Couldn't get it to come.

[¶25] Statements made by Mr. Jensen immediately after the accident corroborate his testimony. Mr. Pittman testified that at the scene Mr. Jensen stated that "he reached down, pulled his foot out from underneath the brake pedal and lost control . . . ." Mrs.

10

Jensen also testified that when Mr. Jensen called her on his cell phone from the scene, he told her that the accident happened when his right foot "got stuck" and "he couldn't get it out."

[¶26] In rejecting this evidence, the Hearing Examiner ruled:

> 66. . . . While the Office finds and concludes that Jensen did have residual problems from the work related injury, i.e., the in toeing and even rolling of the foot, the Office does not find that the preponderance of the evidence shows that those residual problems were the cause of the automobile accident.
>
> 67. As noted above, the weight of the evidence showed that Jensen's residual problems occurred when he was standing, walking and/or weight bearing. Neither Jensen nor his wife ever described the problems occurring when he was seated or driving. There is only one mention in all of the records of Jensen's foot pointing inward while in a seated position. That is in Dr. Tallerico's June 5, 2013 record. While Dr. Altenburg's deposition testimony suggests that there could be problems when someone with Jensen's condition would be lifting a knee and moving it outward, the testimony did not in the Office's opinion rise to the level of proof necessary.
>
> 68. Pittman's testimony that at the scene Jensen made the comment his foot became stuck and he was trying to remove it was compelling, however, it still did not go far enough to make the connection to the work related injury. Further, and more compelling to the Office was the lack of any statements from Ms. Jensen or Jensen himself to the case worker in the days and even the months following the accident. It would certainly seem to the Office that Jensen would have made those comments to the case worker in his conversation with [her] in July. In that regard, it simply appeared to the Office that the rolling of the foot off the pedal became an after the fact theory in this case, not one advanced until the case was referred to the Office.
>
> 69. While the Office found the majority of Jensen's and Mrs. Jensen's testimony credible and the accident was unfortunate indeed, *the Office simply did not accept the testimony that Jensen's foot rolled off the pedal causing the accident given the lack of prior or subsequent complaints or*

*evidence that Jensen had problems with his foot while seated or told anyone at the time of or within the month after the accident that his foot had slipped off the pedal.*

(Emphasis added.)

[¶27] We have held that "[i]n a second compensable injury case, the causal connection between the work injury and the second injury is satisfied if the medical expert testifies that the work injury contributed to the second injury." *Hoffman*, 2012 WY 164, ¶ 17, 291 P.3d at 303. "Our precedent establishes that medical testimony stating the claimant's work 'contributed to' the injury or the injury was 'most likely' or 'probably' the product of the workplace is sufficient to satisfy the requirements." *Middlemass*, 2011 WY 118, ¶ 28, 259 P.3d at 1168 (citing *Boyce v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 9, ¶ 21, 105 P.3d 451, 458 (Wyo. 2005); *Jim's Water Serv. v. Eayrs*, 590 P.2d 1346, 1349 (Wyo. 1979); *Claim of Vondra*, 448 P.2d 313 (Wyo. 1968)).

[¶28] Here, Dr. Altenburg "surmised" that Mr. Jensen "could" have difficulty in lifting his knee and moving it outward. "[S]peculative medical testimony is insufficient to satisfy a claimant's burden of proof." *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 24, 301 P.3d 137, 147 (Wyo. 2013) (citing *Anastos v. General Chemical Soda Ash*, 2005 WY 122, 120 P.3d 658, 666-67 (Wyo. 2005)). The OAH found that Dr. Altenburg's testimony was speculative and did not satisfy Mr. Jensen's burden of proof. We have held that "opinions expressed by medical experts in terms of 'can,' 'could,' or 'possibly' are not sufficient to meet an employee's burden of proof." *Middlemass*, 2011 WY 118, ¶ 28, 259 P.3d at 1168 (quoting *Boyce*, 2005 WY 9, ¶ 22, 105 P.3d at 458); *see also Guerrero*, 2015 WY 88, ¶ 19, 352 P.3d at 268 (physician's statement that it was "possible" claimant's back problems were related to his work injury was not sufficient proof of causation). Thus, Dr. Altenburg's testimony that Mr. Jensen "could" have weakness supports the OAH's determination that Mr. Jensen did not meet his burden of proof.

[¶29] Dr. Altenburg's testimony was not the only medical testimony presented to the OAH. As early as February of 2013, Dr. Zoe noticed that Mr. Jensen had a "decreased [range of motion] with right hip flexion, extension, adduction, abduction, internal rotation, and external rotation." And, Dr. Tallerico's records indicate that Mr. Jensen's walk was "abnormal" with his "toe off" and that he had "weakness in basically all major motor groups in the right lower extremity." He also noted that the tendency of Mr. Jensen's foot to rotate inward occurred in a seated position: "As he sits in the examination chair [it] appears that he does have inversion and internal rotation of his right foot." This evidence, however, does not even reach the point of speculation regarding whether Mr. Jensen's work-related injury caused the accident.

[¶30]   We have held that "the causal connection between the work injury and the second injury is satisfied if the medical expert testifies that the work injury contributed to the second injury." *Hoffman*, 2012 WY 164, ¶ 17, 291 P.3d at 303.   In *Hoffman*, the claimant's treating physician testified that his second injury was "clearly related to" and "more probably resulted from" his original work injury and the treatment of that injury. We held that this testimony satisfied the causal connection requirement under the second compensable injury rule. *Id.*   Here, however, none of this medical evidence relied upon by Mr. Jensen establishes a causal connection between Mr. Jensen's work-related injury and his subsequent accident.

[¶31]   In addition, Mr. Jensen points to the testimony of other witnesses regarding the cause of the accident.   He correctly states that both Mrs. Jensen and Mr. Pittman testified that shortly after the accident he told them his foot had become lodged between the brake and gas pedals, and he was unable to get it out.   He also highlights his own testimony where he described his foot falling from the brake pedal, getting stuck, and his unsuccessful attempts at removing it as the cause of the accident.

[¶32]   We have recognized that

> [t]he testimony of an injured worker alone is sufficient to prove an accident if there is nothing to impeach or discredit the worker's testimony and the worker's statements are corroborated by surrounding circumstances. *Duncan v. Hardware Mutual Casualty Company*, 275 So.2d 462, 463 (La.App. 1973).   Moreover, the occurrence of injuries resulting from accidents to which there are no eye-witnesses does not prevent fair inferences from being drawn and findings of facts from being made. *Bohan v. Lord & Keenan, Inc.*, 98 N.H. 144, 95 A.2d 786, 788 (1953).

*Ikenberry v. State ex rel. Wyo. Workers' Comp. Div. (In re Ikenberry)*, 5 P.3d 799, 803 (Wyo. 2000); *see also Seherr-Thoss v. Teton Cty. Bd. of Cty. Comm'rs*, 2014 WY 82, ¶ 15, 329 P.3d 936, 944 (Wyo. 2014) ("An individual's testimony alone is sufficient to carry the individual's burden if there is nothing to impeach or discredit the individual's testimony and the individual's statements are corroborated by surrounding circumstances.").

[¶33] The Hearing Examiner found Mr. Pittman's testimony to be "compelling," however she noted that the theory advanced by Mr. Jensen was not supported by the circumstances and his testimony did not establish causation.   She observed that Mr. Pittman "did not mention any statements Jensen made . . . that his foot had rolled off the pedal."   It was this lack of evidence of Mr. Jensen's foot rolling off the pedal that led the OAH to conclude that the foot rolling was a theory developed later in the case.   The OAH

rejected Mr. Jensen's testimony that his foot rolled off the pedal due to a lack of prior complaints about his foot while seated and because there was no evidence that he "told anyone at the time or within the month after the accident that his foot had slipped off the pedal." While the record is replete with uncontested evidence that Mr. Jensen complained of weakness, intoeing, and foot rolling in the months prior to the accident, and his doctor also noted his foot's tendency to rotate inward while he was in a seated position, we cannot say that the hearing examiner's conclusion that Mr. Jensen did not meet his burden of proving a causal connection between the automobile accident and his prior work-related accident was unreasonable and not supported by substantial evidence.[1]

[¶34] Evidentiary findings are not supported by substantial evidence when they are "contrary to the overwhelming weight of the evidence in the record as a whole." *Dale*, 2008 WY 84, ¶ 22, 188 P.3d at 561 (citations omitted). "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test." *Id*. at ¶ 22, 188 P.3d at 561. Here, the OAH provided its reasons for rejecting the testimony of Mr. Jensen that his foot had slipped off the pedal. We find that the OAH could reasonably have concluded that Mr. Jensen did not meet his burden of proving by a preponderance of the evidence that his accident was causally connected to his original work-related hip injury.

## *CONCLUSION*

[¶35] The OAH properly applied the second compensable injury rule in this case. The OAH also reasonably concluded, based upon all of the evidence in the record, that Mr. Jensen had not established by a preponderance of the evidence that his automobile accident was causally connected to his original work-related injury. Affirmed.

---

[1] In addition, Dr. Carter, the emergency room physician who treated Mr. Jensen, testified that Mr. Jensen did not tell him that his foot rolled off the gas pedal. Dr. Carter's emergency room report indicates that "[Mr. Jensen] reports that he thinks his truck blew a tire . . . ." Dr. Carter also noted in his report that Mr. Jensen had a GLASCOW score of 15, suggesting that he was alert, talking, and fairly coherent at the time he spoke with Dr. Carter. Dr. Tallerico also treated Mr. Jensen in the emergency room, and in his chart noted that "[u]nfortunately [Mr. Jensen] was involved in a severe motor vehicle accident earlier today when he lost control of his car supposedly while he dozed off . . . ." This evidence contradicts the testimony of Mr. Jensen and other witnesses as to the cause of the accident.