2017 WY 99

In the Matter of The Worker's Compensation Claim of, James D. Boyce, an Employee of Halliburton: James D. BOYCE, Appellant (Petitioner),

v.

STATE of Wyoming, EX REL., DEPARTMENT OF WORKFORCE SERVICES, WORKERS' COMPENSATION DIVISION, Appellee (Respondent).

S-16-0278

Supreme Court of Wyoming.

August 31, 2017

Representing Appellant: Jack D. Edwards of Edwards Law Office, P.C., Etna, WY.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Daniel E. White, Deputy Attorney General; and Michael J. Finn, Senior Assistant Attorney General.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

HILL, Justice.

[¶1] James Boyce suffered an inguinal hernia while working and received workers' compensation benefits to cover that injury. The Wyoming Workers' Compensation Division (Division) denied benefits, however, for subsequently discovered conditions in Mr. Boyce's lumbar spine. The Medical Commission upheld the Division's denial of benefits, and Mr. Boyce appealed. The district court affirmed the Medical Commission's decision, and we likewise affirm.

## ISSUE

[¶2] Mr. Boyce states his single issue on appeal as follows:

**ISSUE ONE:** Whether the Medical Commission provided a sufficient explanation as to why it ruled the way it did.

## FACTS

[¶3] In May 2013, Mr. Boyce was working for Halliburton Energy Services as a "frac hand," which meant he was tasked with delivering equipment and materials to well sites, and setting up and taking down the well equipment. On May 11th, Mr. Boyce was assigned to transport equipment and material from Rock Springs, Wyoming to a well site in Nebraska. Because his delivery included hazardous materials, he was required to have a placard on the back of the eighteen-wheeler warning of the hazardous materials on board. The placard was in place when Mr. Boyce left the Halliburton yard in Rock Springs, but when he stopped at a truck stop a short distance from the yard, he discovered it had fallen off.

[¶4] Mr. Boyce reported the situation to his supervisor, who then met Mr. Boyce at the truck stop and took him to search for the placard. When they located the placard, they pulled over, and the two of them lifted the placard to place it in the back of the supervisor's three-quarter-ton truck. The placard weighed about a hundred pounds and was mounted in an 8.5-foot metal frame. Mr. Boyce and the supervisor were standing on the passenger side of the truck bed, with Mr. Boyce closest to the cab. Each lifted a side of the placard, and because the truck had racks and a diesel tank on the bed closest to the cab, where Mr. Boyce was lifting, he had to stand on his toes to lift it high enough to place it in the truck. When Mr. Boyce did that, he felt a sharp shooting pain down the right side of his groin.

[¶5] Mr. Boyce and his supervisor eventually got the placard into the back of the truck, and once the placard was securely fastened to the back of Mr. Boyce's rig, he continued his trip to Nebraska. After Mr. Boyce completed his Nebraska trip, he returned to his home in Idaho, and on Monday

May 13, 2013, he saw his primary care physician, Dr. Bailey. Dr. Bailey suspected Mr. Boyce had a hernia and referred him to a surgeon for further evaluation.

[¶6] On May 17, 2013, Halliburton submitted a report of injury to the Division, which stated, "Employee was lifting a placard rack back onto a truck and strained groin." On May 24, 2013, the Division issued a Final Determination of Compensability, which stated:

> The Workers' Compensation Division has reviewed your injury report and related documents for the injury of May 11, 2013 and has determined it is compensable and has opened your claim. The body part(s) to be covered are: Right Groin

[¶7] Mr. Boyce was ultimately diagnosed with a right inguinal hernia and referred to Dr. Gregg Marshall for surgery. Due to intervening medical issues, Mr. Boyce's hernia surgery was delayed until June 17, 2013. Nine days after surgery, on June 26, 2013, Mr. Boyce saw Dr. Marshall for a post surgery follow-up and reported substantial pain that he was able to control with medication. Mr. Boyce did not report low back pain during that visit. Dr. Marshall's June 26th post surgery plan was for Mr. Boyce to resume regular activity three weeks after his surgery and to return to work July 22, 2013.

[¶8] On July 9, 2013, Mr. Boyce spoke with a Division claims analyst and informed her that he had been released to return to work on July 22nd, but he "has been having a lot of pain in [his] siatic nerve." On July 11, 2013, Mr. Boyce again saw Dr. Marshall. During that appointment, he complained of "pain in his right gluteus maximus. A pelvic sharp stabbing pain down the hip joint." Dr. Marshall assessed Mr. Boyce:

> 59-year-old male status post right inguinal hernia repair. From the hernia standpoint he is doing very well. He has some musculoskeletal pain in his right hip joint and into his gluteus maximus. I think that this is related to him walking with poor posture prior to his hernia repair.

[¶9] Dr. Marshall referred Mr. Boyce to physical therapy and then saw him again on July 18, 2013. By then Mr. Boyce had undergone two physical therapy treatments "with a small amount of improvement." Dr. Marshall's assessment of Mr. Boyce on that date was "musculoskeletal pain in his right hip joint and into his gluteus maximus," and he recommended continued physical therapy. Mr. Boyce saw Dr. Marshall again on August 1, 2013, and Dr. Marshall noted that Mr. Boyce "continues to have persistent pain radiating from his back and down into his gluteus maximus," and "occasional pain down into his thigh." He further noted:

> [Mr. Boyce] is undergoing [a] modest course of physical therapy to see if his symptoms improve. They have not. I'm concerned about possible disc herniation or lung nerve entrapment. I will obtain an MRI and [have] referred him to a neurosurgeon for further evaluation.

[¶10] On August 20, 2013, Mr. Boyce saw Dr. Gregory Harrison, a neurosurgeon. Dr. Harrison noted, in part:

> * * * Since hernia surgery, the patient reports the right-sided groin pain has improved though is not gone. The right-sided hip/buttock pain has persisted. The pain does not radiate into the thigh or calf nor does he have any paresthesias. * * *

[¶11] Dr. Harrison reviewed an August 8, 2013 MRI of Mr. Boyce's spine, which showed:

> 1. Levoscoliosis with rotary component and leftward spondylolisthesis of L4.
> 2. Multilevel discogenic disease most pronounced at the L3-4 and L4-5 levels and to a lesser degree at L5-S1.
> 3. Mild canal stenosis at L3-4 and L4-5.
> 4. Diffuse posterior disc bulge with focal extrusion right paracentrally to posterolaterally of the L5-S1 disc extending into the lateral canal.
> 5. Multilevel neuroforaminal narrowing as described.
> 6. Bilateral synovial cysts posterolaterlly off the 4-5 facets which do no[t] encroach into the canal.

[¶12] Dr. Harrison diagnosed Mr. Boyce with "a right S1 radiculopathy due to the small but significant disc herniation on the right at L5-S1. He certainly has degenerative changes at L3-4 and L4-5, as noted on the

report." Dr. Harrison recommended steroid injections, noting "a fair chance that he may resolve this disc herniation on his own and without surgery."

[¶13] On October 1, 2013, after two epidural steroid injections, Mr. Boyce again saw Dr. Harrison. Dr. Harrison noted the injections "modestly helped with [Mr. Boyce's] global pain." He concluded:

> * * * He is struggling with his right S1 radiculopathy and a bit of back pain. He has tried a number of conservative/non-surgical measures and he is doing poorly overall regarding pain control. I think it is reasonable to say he has failed conservative measures and I would certainly offer him surgery at this time. I can offer him excellent outcomes, particularly regarding his radicular leg pain, in the situation.
> * * *

[¶14] On October 16, 2013, Dr. Harrison submitted to the Division a request for preauthorization to perform an L3-L5 laminectomy and an L5-S1 discectomy. On October 24, 2013, the Division issued a final determination denying the preauthorization request on the ground that the surgery was not related to the original groin injury. Mr. Boyce objected to the final determination, and on November 14, 2013, the matter was referred to the Medical Commission for a hearing.[1]

[¶15] After Mr. Boyce's claims were referred to the Medical Commission for hearing, Mr. Boyce underwent two independent medical evaluations (IMEs). On December 20, 2013, Mr. Boyce was examined by Dr. Brian Tallerico, a general orthopedic surgeon. Based on his record review and examination of Mr. Boyce, Dr. Tallerico opined that Mr. Boyce's spine conditions were not work related. More particularly, Dr. Tallerico felt that Mr. Boyce's spine was not in fact symptomatic and that the pain he was experiencing was muscular, which he described as "[r]ight gluteal pain and tenderness of unclear origin." Based on his assessment that Mr. Boyce's spine was not symptomatic, he disagreed with Dr. Harrison's surgery recommendation.

Additionally, I respectfully disagree that he is a candidate for an L3 to L5 laminectomy with L5-S1 diskectomy for several reasons. First, he had little, if any relief during the diagnostic and therapeutic phase of his multiple epidural steroid injections. If he had significant stenosis necessitating an L3-5 laminectomy, I would imagine that he would have some relief during the local anesthetic phase of his pain. Additionally, he describes purely gluteal pain with muscular tenderness. This is not radiculopathy. Although he did have some episodes last Friday of the pain going down his entire right leg, that would be seven months following his injury, and therefore, would be unrelated temporally. Furthermore, he has a completely normal neurologic examination in the right lower extremity.

* * * *

He has no orthopedic impairment rating relating to the industrial claim. His degenerative findings in his lumbar spine are pre-existing and in my opinion, actually incidental, and certainly not related to the industrial injury.

[¶16] On February 27, 2014, Mr. Boyce underwent a second IME, this one performed by Dr. Gary Walker, a physiatrist who described his specialty as physical medicine rehabilitation. Based on his record review and examination of Mr. Boyce, Dr. Walker opined that the L3-L5 stenosis was not work related, but the L5-S1 disc protrusion was work related.

> It is my opinion that any treatment for L3-L4 and L5 laminectomy would be unrelated to his work injury and rather related to preexisting, although previously asymptomatic, degenerative disc disease at the L3-L4 and L5 levels primarily. He does, however, have a right L5-S1 acute appearing focal disc protrusion with extruded

---

1. Other disputed claims were also referred to the Medical Commission, including claims for continuing temporary total disability benefits, treatment of ischemic colitis and atrial fibrillation, and other services related to treatment of Mr. Boyce's spine. The Division ultimately agreed to pay benefits in relation to the ischemic colitis and atrial fibrillation, and the remaining disputed claims were combined for hearing by the Commission.

fragment in the lateral recess impacting the descending S1 root. It is a very focal protrusion and matches his pain. It also matches with his sensory change in the right lateral foot. It is my opinion that it is more probable than not that the right L5-S1 disc extrusion is indeed work related. The initial pathology indeed may have come on associated with the lifting; however, may also have come on with the bending over and walking flexed associated with his right inguinal hernia. Either way, the causation would be industrial related. I disagree with Dr. Tallerico's independent medical examination. In fact in Dr. Tallerico's independent medical examination, he does not even comment that the patient has a right L5-S1 disc extrusion as seen on the MRI scan. He comments only about degenerative changes; therefore I do not think that Dr. Tallerico's opinion is complete as it does not even consider the L5-S1 disc extrusion.

[¶17] The Medical Commission held an evidentiary hearing on March 27, 2015. The evidence presented to the Medical Commission included Mr. Boyce's medical records, Dr. Harrison's deposition testimony, Dr. Tallerico's IME report and deposition testimony (submitted by the Division), and Dr. Walker's IME report and deposition testimony (submitted by Mr. Boyce). On May 7, 2015, the Medical Commission issued its Findings of Fact, Conclusions of Law, and Order of Medical Commission Hearing Panel, which upheld the Division's denial of benefits for Mr. Boyce's spine conditions. In so ruling, the Medical Commission found, in part:

15. The Medical Hearing Panel herein finds that the opinion of Dr. Harrison is quite equivocal. He was unable to clearly document radiculopathy on August 20, 2013, several months after the reported work injury. In addition, we note that he had taken a very poor history from Mr. Boyce, and had an inadequate working knowledge of the mechanism of injury, and/or any preexisting problems that may have existed. When asked why he had indicated in his records that the proposed surgery was a Workers' Compensation injury, Dr. Harrison indicated it was because Mr. Boyce had told him it was.

We find that Dr. Harrison's opinion is equivocal and nonspecific, and is nonsupportive of Mr. Boyce going through the requested surgery as a workers' compensation industrial claim.

Of significant importance, is also the fact that Mr. Boyce did not reveal any sort of specific right-sided lumbar pain until after the hernia surgery. This is noteworthy, in that it is clear that he has an extremely degenerative and problematic spine, that could be easily exacerbated or made symptomatic from a multitude of conditions, as noted by Dr. Harrison and Dr. Walker. Mr. Boyce himself, during trial, was uncertain and very vague about the onset of the lumbar pain and the reason for it. We do note that he was attempting wood chopping on one occasion, shortly after his spinal injections, and it became very quickly obvious to him that was an activity that he should not be engaged in. Certainly, the act of picking up an ax overhead and swinging down could cause pathology in a severely degenerated spine.

In addition, we find that the opinion of Dr. Tallerico, although not perfect, is the most persuasive. Dr. Walker, a nonsurgeon, did a detailed report, and only disagreed with part of Dr. Harrison's request for preauthorization surgery, finding the L3-L5 levels to be preexisting and not related to the work injury but the L5-S1 levels to be due to the work injury. We find that this is speculative on the part of Dr. Walker, and also find that he did not give sufficient emphasis on the fact that Mr. Boyce did not complain of specific lumbar type pain until after the hernia surgery.

This case is medically complex and further complicated by the extremely degenerated condition of Mr. Boyce's lumbar spine, as is clearly documented in the radiologic studies. Mr. Boyce has a congenitally narrow spinal canal, degenerative disc pathology, and a clearly identified extruded disc, which is likely the source of his ongoing and continued complaints at the present time. However, the medical panel is not convinced that Mr. Boyce has met his burden of proof in establishing within a

reasonable degree of medical probability that the May 11, 2013 work incident while employed at Halliburton was the causative reason for any sort of lumbar pathology that now requires surgery. The medical panel finds that the employee/claimant has not met his burden of proof[.]

[¶18] Under its conclusions of law, the Medical Commission concluded:

6. * * * We find that the opinions of Dr. Tallerico are the most persuasive. He is a trained orthopedic surgeon, and we feel that he provided a comprehensive workup, and he was unable to determine that Mr. Boyce had documented lumbar radiculopathy.

Dr. Harrison was working with a poor medical history, and was more concerned with finding a solution for Mr. Boyce['s] issues than determining the causation of the lumbar pathology. Dr. Walker, a non-surgeon, felt that the disc extrusion was likely caused by the industrial accident, or leaning over while awaiting hernia surgery, but we find this to be largely speculative. As noted by all the physicians, the extruded disc in Mr. Boyce['s] extremely degenerated spine could have been caused by a multitude of non-work related conditions. We place a great deal of weight on the late reporting of radiculopathy-type issues, which only were documented after the hernia surgery. No physician has opined that the hernia surgery, or complications of that procedure, were responsible for the lumbar spine issues.

* * * *

8. * * * We find that the requested surgery may indeed be reasonable and necessary under the circumstances, but the procedure requested by Dr. Harrison has not been established to our satisfaction to be related to the industrial injury of May 11, 2013.

[¶19] On June 9, 2015, Mr. Boyce filed a petition for judicial review in district court, and on October 28, 2016, the district court issued an order affirming the Medical Commission's ruling. Mr. Boyce thereafter filed a timely notice of appeal to this Court.

STANDARD OF REVIEW

[¶20] We review an administrative appeal as if it came directly from the administrative agency, giving no deference to the district court's ruling on the appeal. *Price v. State ex rel. Wyo. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 16, ¶ 7, 388 P.3d 786, 789 (Wyo. 2017). Our review is governed by statute and requires that we:

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

* * * *

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2017).

[¶21] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Price*, ¶ 7, 388 P.3d at 789-90 (quoting *Jensen v. State ex rel. Wyo.Dep't of Workforce Servs., Workers' Comp. Div.*, 2016 WY 87, ¶ 13, 378 P.3d 298, 303 (Wyo. 2016)). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Id.* We review a conclusion that the claimant failed to meet his burden of proof as follows:

If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon

determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Price*, ¶ 7, 388 P.3d at 790 (quoting *Worker's Comp. Claim of Bailey v. State ex rel. Wyo. Dep't of Workforce Servs.*, 2015 WY 20, ¶ 11, 342 P.3d 1210, 1213 (Wyo. 2015)).

## DISCUSSION

■ [¶22] An employee bears the burden of proving a claim for worker's compensation benefits. We have said:

A compensable injury is one "arising out of and in the course of employment[.]" Wyo. Stat. Ann. § 27–14–102(a)(xi) (Lexis-Nexis 2013). In order to show that the compensable injury arises out of or in the course of employment, the worker's compensation claimant has the burden of proving each of the essential elements of the claim by a preponderance of the evidence, including a causal connection between the work-related incident and the injury. *Stevens v. State ex rel. Dep't of Workforce Servs.*, 2014 WY 153, ¶ 35, 338 P.3d 921, 929 (Wyo.2014). The claimant must show the causal connection to a reasonable degree of medical probability. Typically, this requires expert medical testimony that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation, or acceleration of the injury. *Id.*, ¶ 50 n. 6, 338 P.3d at 932 n.6.

*Leib v. State ex rel. Wyo. Dep't of Workforce Servs., Workers' Comp. Div.*, 2016 WY 53, ¶ 12, 373 P.3d 420, 424 (Wyo. 2016).

■ [¶23] An employee's burden of proof consists of two components: the burden of production and the burden of persuasion. *Hirsch v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2014 WY 61, ¶ 40, 323 P.3d 1107, 1116 (Wyo. 2014) (quoting *Little v. State ex rel. Wyo. Dep't of Workforce Servs., Workers' Comp. Div.*, 2013 WY 100, ¶ 34, 308 P.3d 832, 842 (Wyo. 2013)).

The burden of production "involves the obligation of a party to present, at the appropriate time, evidence of sufficient substance on the issue involved to permit the fact finder to act upon it." [*Little*, ¶ 34, 308 P.3d at 842] (quoting *Joyner v. State*, 2002 WY 174, ¶ 18, 58 P.3d 331, 337 (Wyo. 2002)). In turn, the burden of persuasion is "the burden of persuading the trier of fact that the alleged fact is true." *Id.* (quoting *2 McCormick on Evidence* § 336, at 664 (7th ed.2013)).

*Hirsch*, ¶ 40, 323 P.3d at 1116.

[¶24] The Medical Commission found that Mr. Boyce failed to prove that the May 11, 2013 work incident caused his spine condition or need for spinal surgery. The Commission's decision was based not on a failure by Mr. Boyce to produce evidence of causation, but rather on a failure of Mr. Boyce to carry his burden of persuasion. The Commission was ultimately not persuaded by Mr. Boyce's evidence, including the opinion of Dr. Walker, which the Commission found was speculative and failed to account for the delay in the onset of Mr. Boyce's spinal symptoms.

[¶25] Mr. Boyce contends that the record does not support the Commission's rejection of his evidence. In particular, he argues that the Commission erred in discounting Dr. Walker's opinion based on his nonsurgical practice, and in rejecting Dr. Walker's opinion on grounds that the opinion was speculative and failed to account for Mr. Boyce's delayed onset of symptoms. Mr. Boyce further contends that Dr. Tallerico's opinion was not supported by substantial evidence and the Commission thus erred in relying on that opinion to determine causation.

■ [¶26] Although Mr. Boyce stated his issue on appeal as a question of whether the Commission adequately explained its decision, the substance of his arguments is not whether the Commission failed to explain its decision, but rather whether the evidence supports its decision. We will therefore consider each of these arguments by looking to whether the Medical Commission could reasonably reject Mr. Boyce's evidence and whether its conclusion that Mr. Boyce failed to meet his burden of proof was contrary to the overwhelming weight of the evidence. *See*

*Price,* ¶ 7, 388 P.3d at 790. We also recognize:

> [M]embers of the Commission have medical expertise which enables them to understand and render decisions in technical cases like this one. As the trier of fact, the Commission must weigh the evidence and determine witness credibility. *See Hoffman [v. State ex rel., Wyo. Workers' Safety and Comp. Div.],* 2012 WY 164, ¶ 23, 291 P.3d [297] at 305 [ (Wyo. 2012) ]; *Brierley v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2002 WY 121, ¶ 16, 52 P.3d 564, 571 (Wyo. 2002). The Commission is entitled to disregard expert medical opinion if it "finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete or inaccurate medical history...." *Johnson v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2014 WY 33, ¶ 25, 321 P.3d 318, 325 (Wyo. 2014).

*Price,* ¶ 15, 388 P.3d at 791-92; *see also Vandre v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2015 WY 52, ¶ 19, 346 P.3d 946, 952-53 (Wyo. 2015) (fact finder has "wide latitude to 'determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented,' including medical evidence and opinion" and Court will overturn such determinations only if "clearly contrary to the great weight of the evidence").

## A. Medical Commission's Rejection of Dr. Walker's Opinion

### 1. Rejection of Dr. Walker's Opinion as Speculative

[¶27] Mr. Boyce contends that Dr. Walker gave a reasoned explanation for his opinion that the work injury caused the L5-S1 herniation and the Medical Commission therefore erred in finding Dr. Walker's opinion speculative. In support of this argument, he cites to Dr. Walker's discovery deposition testimony that Mr. Boyce had pain "very specifically at L5-S1" and a "pattern of pain down the leg [that] very much fit with the right L5-S1 lesion." He further cites to the opinion Dr. Walker provided in that same discovery deposition:

To go on in that same vein though, an L5-S1 disk protrusion can also be found in normal people. Over age 40, up to 25 percent of the population has a protrusion and does not know it and has no symptoms. But in a person who comes in presenting with symptoms that fit and correlate with a disk herniation, then you have to opine that it's more probable than not new and related to such injury.

[¶28] Mr. Boyce's argument fails to account for our standard of review. The question on appeal is not whether the Medical Commission had a basis for accepting Dr. Walker's opinion. The question is whether the Commission acted reasonably in rejecting that opinion as speculative, or whether the Commission's rejection of the evidence was contrary to the overwhelming weight of the evidence. *See Price,* ¶ 7, 388 P.3d at 790. Considered in this light, we must give the Commission's weighing of Dr. Walker's opinion the deference to which it is entitled.

[¶29] In his trial deposition, Dr. Walker adhered to his opinion that either the May 11, 2013 lifting incident or Mr. Boyce's walking hunched over prior to his hernia surgery caused the L5-S1 disc herniation. Dr. Walker also testified, however, that he could not distinguish between either of these potential causes of the herniation or explain the delay in the onset of symptoms.

Q. Okay. And you're unable to—are one of those causes more likely than the other or equally likely?

A. Boy, I don't know how to separate either of those. Either could be the cause. The walking bent over would fit more temporally because the onset came after the surgery and after he'd been walking bent over rather than immediately. However, lifting something that heavy overhead certainly could have started this process. Who knows. Maybe it was worsened by being hunched over.

Q. Is there anything on the MRI or the other radiologic studies that would indicate an acuteness to this disk protrusion?

A. Not really.

Q. Talking about the lifting, let's talk about whether or not this was caused—this exacerbation was caused from lifting. Is

there an explanation why there's no indication of pain, at least in the low back, until approximately nine days after his hernia surgery?

A. I can't really give a good explanation other than I do on occasions have patients who have a very severe pain, such as in his case, his right groin, and it masks another pain that's not as severe. And he was, you know, bent over. He was on narcotics around the surgical time and it may, in fact be that it wasn't until he started getting off some of the narcotic that this pain kind of showed through.

[¶30] Finally, Dr. Walker also testified:

Q. What other things can cause that disk to either become extruded or if it was already extruded become symptomatic, apart from walking hunched over?

A. I mean, you could do pages of lists of different things. I mean, you can herniate or extrude a disk coughing and sneezing. You could do it making a bed. You could do it, you know, bending over. You could do it slipping and falling and landing on your buttock. I mean, there's a host of ways a disk can herniate or extrude.

[¶31] We have recognized that medical opinions expressed in terms of "can," "could," or "possibly" are speculative and have upheld a fact finder's rejection of such opinions. *Jensen v. State ex rel. Wyo. Dep't of Workforce Servs., Workers' Comp. Div.*, 2016 WY 87, ¶ 28, 378 P.3d 298, 307 (Wyo. 2016) (quoting *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 28, 259 P.3d 1161, 1168 (Wyo. 2011)). Although Dr. Walker testified in response to a wrap-up question that his opinions were given to a reasonable degree of medical probability and that he did not deviate from that standard in his testimony, such a blanket statement cannot erase or alter opinions that by their very terms were not stated to a degree of medical probability. The above-quoted testimony casts Dr. Walker's opinion in a speculative light, and given that testimony, we cannot say that the Medical Commission acted unreasonably or contrary to the overwhelming weight of the evidence in rejecting Dr. Walker's opinion.

## 2. Rejection of Dr. Walker Opinions Based on Delayed Symptoms

[¶32] In addition to rejecting Dr. Walker's causation opinion as speculative, the Medical Commission also rejected the opinion because it failed to account for the delay in the onset of Mr. Boyce's back-related symptoms. Mr. Boyce contends that this was error because the record contains no evidence that delayed onset of pain is relevant to the question of causation. We disagree.

[¶33] First, this Court has recognized that the timing of symptoms is relevant to causation. *Leib*, ¶ 14, 373 P.3d at 424 (quoting *Kiczula v. American National Can Company*, 310 N.J.Super. 293, 708 A.2d 742, 746 (N.J. App. 1998) ("Evidence of the timing of symptoms has been specifically recognized as a competent way of studying causation[.]")). Additionally, the record contains evidence, including from Dr. Walker, that the timing of symptoms is relevant to the question of causation.

[¶34] Dr. Walker testified, "[I]f you get a temporal history and then the MRI fits completely with it, then I think you're in a position to state that it's more probably than not connected." He further testified:

* * * I have to simply rely largely on a patient's history and honesty and then try to link the mechanism temporally to their symptoms and then have MRI findings that correlate with that. And if everything lines up, then I have to go with that.

[¶35] Dr. Harrison likewise testified that timing of symptoms is relevant to determining causation:

Q. Would it matter, Doctor, if he mentioned that immediately after the incident versus he didn't mention it for another two months after the incident or three months?

A. Maybe.

Q. In what respect would it maybe matter?

A. Well, the temporality of it. You know, if it happened sooner after the injury, yeah, you might argue that it was from the injury. If it happened later, maybe that's the natural history of the disease.

[¶36] Dr. Harrison further testified:

Q. * * * And I'm wondering if you can give me any explanation why it took more than two and a half months—if he was, in fact, injured at the time of the May 11th incident, why it took two and a half months for there to be any mention of low-back pain?

A. I don't know.

[¶37] Dr. Tallerico was much less focused in his report and testimony on the timing of Mr. Boyce's lumbar symptoms because it was his opinion that Mr. Boyce's spine was not symptomatic. He did note in his report, however, that "[a]lthough [Mr. Boyce] did have some episodes last Friday of the pain going down his entire right leg, that would be seven months following his injury and therefore, would be unrelated temporally."

[¶38] Given the record and our general recognition that the timing of symptoms is relevant to causation, we again cannot say the Medical Commission acted unreasonably or contrary to the overwhelming weight of the evidence in rejecting Dr. Walker's opinion for failing to adequately account for the delayed onset of symptoms.

### 3. Discounting of Dr. Walker's Opinion as a Non-Surgeon

[¶39] Mr. Boyce contends that the Medical Commission erred in discounting Dr. Walker's opinion as a non-surgeon because the record contains no evidence that a non-surgeon's opinion is less reliable than a surgeon's opinion. Although we agree that the record does not support discounting Dr. Walker's opinion on this basis, we conclude that the error was harmless.

[¶40] The qualifications and experience of an expert is a factor we expect a fact finder to consider in weighing medical opinion evidence. *Little*, ¶ 37, 308 P.3d at 843 (quoting *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005)) (factors to be considered in weighing expert opinion include "the qualifications and credibility of the witness or witnesses expressing it."). We will defer to a fact finder's determination in that regard if it is supported by the record. *Vandre*, ¶ 19, 346 P.3d at 952-53 (noting fact finder's "wide latitude" to ascribe weight to medical evidence opinions). We have also, however, rejected the discounting of a medical opinion based on the medical expert's specialty where the record does not support such a discounting. *Id.*, ¶ 40, 346 P.3d at 961.

We also reject the suggestion that Dr. Berry's opinion should be discounted because he is a family practice physician rather than a pulmonologist. It is true, as the Division argues, that the hearing examiner drew no further conclusions based on his observation of Dr. Berry's practice. Nonetheless, the hearing examiner found that "it must be noted," so we assume he attached some significance to the observation. The record contains no evidence that a family practice physician is not qualified to offer an opinion on COPD and its complications, and Dr. Berry testified that much of his practice is concerned with lung and heart problems.

*Vandre*, ¶ 40, 346 P.3d at 961.

[¶41] Dr. Walker testified that since 1995, his practice has been "focused on neuromusculoskeletal injuries, diseases, and their nonsurgical treatment." While Dr. Walker specializes in non-surgical treatment, there is nothing in the record to suggest that this undermines his ability to diagnose an injury. Indeed, Dr. Tallerico agreed that Dr. Walker was qualified to diagnose lumbar spine injuries.

Q. Are you—I just want to clarify. You're not sitting here saying that you have a specific objection to the field of physiatry performing independent medical evaluations?

A. Of course not.

Q. And appended to Dr. Walker's report, I don't know if you have it, but I show here that he's board certified by the American Board of Physical Medicine and Rehabilitation and the American Board of Electrodiagnostic Medicine. Do you have that?

A. I do.

Q. Okay.

A. It's at the bottom of his report.

Q. Does this give you any reassurances on his ability to diagnose lower back and lumbar spine injuries?

A. I believe he's qualified to do so. I wouldn't have any reason not to.

[¶42] The record contains no evidence to support a finding that Dr. Walker's opinion should be discounted based on his non-surgical practice. The Division does not contend otherwise but instead points to our decision in *Little*, where we upheld a hearing examiner's decision to accept the opinion of an orthopedic surgeon over that of an internist. *See Little*, ¶¶ 38-39, 308 P.3d at 843. The Division's reliance on *Little* is misplaced because, while this Court did uphold the hearing examiner's weighing of the expert opinions, we did so based on the record support for that determination.

On the other hand, Dr. Torkelson's report indicates that there was no connection between the work injury and the arthritic hip joint. Dr. Torkelson is an orthopedic surgeon who specializes in treatment of musculo-skeletal problems and performs surgical procedures such as hip replacements. *Dr. Patel acknowledged that an orthopedic surgeon would be better equipped to answer questions about the general timeline and risk factors involved with arthritis.* Dr. Torkelson's report did just that, concluding that "[o]steoarthritis in a person of [Mr. Little's] age is not unusual in the absence of any injury." He also noted "no evidence of diagnosis of osteoarthritis of his hips at any time during multiple physician visits from 1988 to 2007." *The hearing examiner was entitled to believe Dr. Torkelson over Dr. Patel, because Dr. Patel was less qualified to testify about the onset of arthritis by his own admission,* and because Dr. Patel diluted his testimony by the use of qualifying language.

*Little*, ¶ 39, 308 P.3d at 843 (emphasis added).

[¶43] Because the record contains no evidence that Dr. Walker's opinion on causation was less reliable because he is a non-surgeon, the Medical Commission erred in discounting his opinion on that basis. We find this error harmless, however, because as dis-

cussed above, the record did support the Commission's finding that Dr. Walker's opinion was speculative and failed to adequately account for the delayed onset of Mr. Boyce's spinal symptoms.[2]

## B. Medical Commission's Acceptance of Dr. Tallerico's Opinion

[¶44] In his final argument, Mr. Boyce contends that the Medical Commission erred in accepting Dr. Tallerico's opinion because that opinion was not supported by the record. In particular, Mr. Boyce challenges two premises underlying Dr. Tallerico's opinion: 1) his finding that Mr. Boyce had no relief from epidural injections; and 2) his finding that Mr. Boyce had no complaints or history of radicular pain. Mr. Boyce is correct that the record contains conflicting evidence concerning his relief from epidural injections and his history of radicular pain. In the end, however, we find that Dr. Tallerico's opinion had little bearing on the Medical Commission's decision, and we therefore find it unnecessary to delve into the record support for Dr. Tallerico's opinion.

[¶45] As we noted above, Dr. Tallerico's opinion on the cause of Mr. Boyce's spinal condition was not based on the timing of Mr. Boyce's symptoms. Dr. Tallerico acknowledged the deteriorated condition of Mr. Boyce's spine but he did not believe Mr. Boyce was experiencing pain related to the condition of his spine. He viewed Mr. Boyce's current and historical complaints as "purely gluteal pain with muscle tenderness," and not as radiculopathy. Simply stated, in Dr. Tallerico's view, there was spinal pathology but there were no spinal symptoms, so his spinal condition could not be linked to the May 11, 2013 work incident.

[¶46] The Medical Commission, on the other hand, found that Mr. Boyce's spine was symptomatic, that Dr. Harrison's surgery recommendation may in fact be the reasonable course to take, but Mr. Boyce failed to show that the May 11, 2013 work incident led to his spinal symptoms and need for surgery. It is perplexing that the Medical Commission

---

2. This distinguishes the present case from *Vandre*. In *Vandre*, we found each ground the hearing examiner cited as a basis to reject the treat-

ing physician's opinion to be contrary to the overwhelming weight of the evidence. *Vandre*, ¶¶ 34-41 346 P.3d at 959-61.

referred to Dr. Tallerico's opinion as "the most persuasive opinion," and then proceeded to make findings and conclusions that disregarded that opinion. Despite this inconsistency in the Commission's decision, we conclude that the record supports its ultimate conclusion.

[¶47] The Medical Commission concluded that Mr. Boyce failed to meet his burden of proof based on the delayed onset of his spine-related symptoms. In that regard, the Commission made findings that Mr. Boyce's testimony as to the timing and cause of his symptoms was "uncertain and very vague." The Commission further found that the medical opinion evidence submitted by Mr. Boyce did not adequately explain the delayed onset of Mr. Boyce's spinal symptoms. This conclusion is not contrary to the overwhelming weight of the evidence.

[¶48] Mr. Boyce testified that he had no back pain at the time of the May 11, 2013 lifting incident or prior to his hernia surgery. He further testified that when he first experienced what he considered to be low back pain, it was a pain in his buttocks that he experienced seven or eight days after his hernia surgery. Finally, he testified that when he first saw Dr. Harrison on August 20, 2013, he had not experienced pain or numbness radiating down his legs, and he was not sure, but probably the first time he experienced that type of pain was three to four weeks before he went to see Dr. Tallerico for his IME.

[¶49] With regard to the medical opinion evidence, the Medical Commission found Dr. Harrison's opinion equivocal and unhelpful because it was based on a poor history taken from Mr. Boyce and an inadequate knowledge of the injury mechanism. Mr. Boyce does not challenge this finding. That leaves Dr. Walker's opinion, which the Commission found speculative as to both the cause of injury and the delay of symptoms. As we discussed above, that conclusion is supported by the record.

[¶50] Given the record before the Medical Commission, we cannot say the Commission acted contrary to the overwhelming weight of the evidence in finding that Mr. Boyce did not meet his burden of proof. The inconsistencies in the Medical Commission's both accepting and then disregarding Dr. Tallerico's opinion do not change this result.

## CONCLUSION

[¶51] The Medical Commission did not act unreasonably or contrary to the overwhelming weight of the evidence in rejecting the opinion of Mr. Boyce's medical expert and in concluding that Mr. Boyce failed to meet his burden of proving that his work injury caused his need for spinal surgery. Affirmed.